**In re FLAG TELECOM HOLDINGS, LTD. SECURITIES LITIGATION**

This Document Relates to: All Actions

No. 02 CIV. 3400(WCC).

United States District Court, S.D. New York.

Jan. 12, 2005.

---

Milberg Weiss Bershad & Schulman, LLP, Lead Counsel for Plaintiff and the Class, Brad N. Friedman, Esq., Rachel S. Fleishman, Esq., Elizabeth A. Berney, Esq., Alisha C. Smith, Esq., Of Counsel, Kirkland & Ellis LLP, New York, NY, Matthew O. Solum, Esq., Of Counsel, Kirkland & Ellis LLP, Washington, D.C., Thomas D. Yannucci, P.C., James P. Gillespie, Esq., Craig S. Primis, Esq., Matthew E. Papez, Esq., John C. O'Quinn, Esq., Of Counsel, for Defendant Verizon Communications Inc.

Clifford Chance U.S. LLP, Attorneys for Defendant Citigroup Global Markets, Inc., New York, NY, James N. Benedict, Esq., Mark A. Kirsch, Esq., Robert G. Houck, Esq., Andrea Goldbarg, Esq., Michael D. Torpey, Esq., Stephen M. Knaster, Esq., M. Todd Scott, Esq., Of Counsel.

Shearman & Sterling, Attorneys for Defendant Flag Telecom Holdings, Ltd. and Individual Defendants Andres Bande, Larry Bautista, Andrew Evans, Lim Lek Suan, Edward McCormack, Edward McQuaid, Daniel Petri and Philip Seskin, New York, NY, Jerome S. Fortinsky, Esq., Tammy P. Bieber, Esq., Michael T. Rasnick, Esq., Panagiotis Katsambas, Esq., Of Counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Peter Loftin brings this proposed class action against defendants Flag

Telecom Holding Group, Ltd. ("Flag"), Salomon Smith Barney, Inc. n/k/a Citigroup Global Markets, Inc. ("Citigroup" or the "underwriter"), Verizon Communications, Inc. ("Verizon") and nine individual defendants: Andres Bande, Edward McCormack, Andrew Evans, Larry Bautista, Stuart Rubin, Daniel Petri, Edward McQuaid, Philip Seskin and Dr. Lim Lek Suan (collectively referred to as the "individual defendants").[1] Plaintiff purports to bring suit on behalf of those who purchased Flag's stock from February 16, 2000 through February 13, 2002 (the "class period"). On October 18, 2002, this Court consolidated several similar suits raising claims under the federal securities laws against defendants, named Loftin lead plaintiff and appointed Milberg Weiss Bershad Hynes & Lerach n/k/a Miberg Weiss Bershad & Schulman lead counsel. Plaintiff subsequently filed a Second Corrected Consolidated Amended Complaint ("2CCAC") and the individual defendants, Citigroup and Verizon moved to dismiss the 2CCAC.[2] We dismissed the 2CCAC but granted plaintiff leave to replead his claims against all defendants named in the 2CCAC. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F.Supp.2d 249, 274 (S.D.N.Y.2004) (Conner, J.) (hereinafter "*Flag I* ").

In the Third Consolidated Amended Complaint ("3CAC") plaintiff alleges that Flag, Citigroup and the individual defen-

dants are liable under § 11 and § 12(a)(2) of the Securities Act of 1933 (the "Securities Act"). Plaintiff also asserts claims against Verizon and the individual defendants under § 15 of the Securities Act. Additionally, plaintiff alleges that Flag, Bande, McCormack, Bautista and Evans violated § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder and that Verizon, Bande, McCormack, Bautista and Evans are liable under § 20(a) of the Exchange Act. The Flag defendants, Verizon and Citigroup move to dismiss pursuant to Rules 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for failure to state a claim. For the reasons stated herein, we grant the motions of Flag, Evans and Verizon to dismiss the claims raised in the 3CAC against them. Defendant Bautista's motion to dismiss is granted in part and denied in part. Finally, the motions of defendants Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan, and Citigroup to dismiss are denied in their entirety.[3]

## BACKGROUND

### I. *Flag's Initial Public Offering (the "IPO")*

Flag offered its shares to the general public in an IPO held on February 16, 2000. (3CAC ¶ 90.) The company's Prospectus (the "Prospectus") was incorporat-

---

1. Flag and the individual defendants are referred to collectively as the "Flag defendants."

2. Flag Telecom Group Limited ("FTGL"), the reorganized successor to Flag, was initially named as defendant in the First Consolidated Amended Complaint ("1CAC") instead of Flag. Because Flag, rather than FTGL, should have been named as a party in this action, the individual defendants and FTGL stipulated to an amendment to the 1CAC adding Flag as a party and dropping FTGL. Plaintiff subsequently filed the 2CCAC. However, as dis-

cussed *infra* in the Discussion Section Part II., on March 19, 2004, counsel for the individual defendants and plaintiff revealed at a conference held before this Court (the "March 2004 Conference") that neither the 2CCAC nor any previous consolidated complaint had been served upon Flag.

3. Plaintiff moves to strike certain documents submitted by defendants on their motion to dismiss. We conclude that none of the documents offered by defendants supports dismissal of any of plaintiff's claims. Accordingly, we deny as moot plaintiff's motion to strike.

ed into the Registration Statement (the "Registration Statement") filed in connection with the IPO.[4] Bande, Flag's Chief Executive Officer ("CEO"), McCormack, Flag's Chief Financial Officer ("CFO"), and Rubin and Suan, both members of Flag's Board of Directors, signed the Registration Statement. (Registration Statement at II–7.) In addition, McQuaid and Seskin were also members of Flag's Board of Directors at the time of the IPO and signed the Registration Statement. (3CAC ¶¶ 59, 60.)

In the Prospectus, Flag stated that its goal was to become a leading "global carriers' carrier" and that it intended to achieve this goal through the expansion of its fiberoptic cable network. (3CAC ¶ 2; Registration Statement at 2.) At the time of the IPO, Flag's network consisted of: (1) the Flag Europe–Asia cable system ("FEA system") which linked to "communications networks in the United Kingdom, Spain, Italy, Egypt, Jordan, Saudi Arabia, the United Arab Emirates, India, Malaysia, Thailand, Hong Kong, China, Korea and Japan," (Registration Statement at 46); and (2) terrestrial connections linking a host of major European metropolitan areas. (Id. at 37.) Flag sold access to its network on a wholesale basis to international carriers, telecommunications companies and internet service providers. (3CAC ¶ 2.) Customers could purchase broadband telecommunications capacity on Flag's network pursuant to a Right of Use contract ("ROU") or an Indefeasible Right of Use agreement ("IRU"). (Registration Statement at 43.) Capacity on Flag's network was "portable." Thus, customers that acquired capacity on one segment of Flag's network could later obtain capacity on a different segment in response their changing needs. (Registration Statement at 43.)

Flag's Prospectus revealed that it was in the process of expanding its global network through the construction of the Flag–Atlantic 1 cable system (the "FA–1 system"). (3CAC ¶ 4.) The FA–1 system was a joint venture between Flag and GTS Transatlantic Holdings Ltd. ("GTS") to build two digital fiberoptic cables connecting Paris and London to New York. (Id.; Registration Statement at 37.) The two cables would create a "self-healing ring"; if one cable failed, Flag could re-route the traffic on that cable onto the other cable in order to avoid service interruptions. (Registration Statement at 37.) The Prospectus also indicated that Flag might expand its network further by constructing or acquiring digital fiberoptic cables in other areas of the world or by purchasing capacity from competitors where "rapid access to a market [was] required or where it [was] not economically feasible to" construct or acquire new systems. (Id. at 2.)

## A. The Allegedly Misleading Statements or Omissions in the Prospectus Concerning Demand

Plaintiff alleges that Flag falsely stated in the Prospectus that market demand for broadband telecommunications capacity was strong at the time of the IPO and that demand was growing. Plaintiff points to the following statement in the Prospectus:

We developed and are enhancing the FLAG Telecom network and our product and service offerings to participate in the following important growth and strategic shifts in the international telecommunications markets: ...

RAPID GROWTH OF TELECOMMUNICATIONS TRAFFIC. According to an August 1999 research report published by Ovum Ltd., total world telecommunications traffic demand is ex-

---

4. The effective date of the Registration State-  ment was February 11, 2000. (3CAC ¶ 90.)

pected to grow more than 50–fold between 1999 and 2005, with Internet and data traffic accounting for 98% of total traffic by 2005 . . . .

IMPACT OF GLOBAL DEREGULATION. The continued deregulation of the global telecommunications industry has resulted in a significant increase in the number of competitors, including traditional carriers, wireless operators, Internet service providers and new local exchange service providers. This change in the global competitive landscape is generating significant demand for broadband telecommunications capacity as carriers seek to secure sufficient capacity for their expansion plans. . . . Global deregulation has also resulted in increased demand for city-to-city services, as new entrants to the telecommunication industry seek to take advantage of the economic benefits of controlling facilities on an end-to-end basis.

(Registration Statement at 39.) Plaintiff contends that these statements were false when issued because as of February 11, 2000, the effective date of the Registration Statement, FLAG possessed information demonstrating that the supply of broadband telecommunications capacity had substantially outstripped the market demand for that capacity. (3CAC ¶ 81.)

### B. *Cautionary Language In the Prospectus*

In a section of the Prospectus entitled "RISKS RELATED TO OUR INDUSTRY," Flag disclosed the following:

BECAUSE OUR PRODUCT OFFERINGS ARE EXPANDING AND THE TELECOMMUNICATIONS INDUSTRY IS CHANGING SIGNIFICANTLY, WE FACE COMPETITION AND PRICING PRESSURE FROM A WIDE VARIETY OF SOURCES.

Along the FLAG Europe–Asia cable route and the FLAG Atlantic–1 cable route, we face competition and pricing pressures from existing cables, planned cables, and satellite providers, including existing geosynchronous satellites and low-earth orbit systems now under construction. . . .

Many of our competitors have, and some potential competitors are likely to enjoy, substantial competitive advantages, including the following:

— greater name recognition;

— greater financial, technical, marketing and other resources;

— larger installed bases of customers; and

— well established relationships with current and potential customers.

Significant new and potentially larger competitors could also enter our market as a result of regulatory changes or the establishment of cooperative relationships. In addition, recent technological advances may greatly expand the capacity of existing and new fiberoptic cables. Although such technological advances may enable us to increase our capacity, an increase in the capacity of our competitors could lead to even greater competition. Increased competition could lead to price reductions, fewer large-volume sales, under-utilization of resources, reduced operating margins and loss of market share.

(Registration Statement at 11.)

Flag disclosed the following information in the Prospectus concerning competition in certain markets:

GLOBAL SERVICES COMPETITORS

A number of companies are presently engaged in building global carriers' carrier networks. We believe that because of the high cost of building truly global networks this is a market in which there

will always be a limited number of players.

Two other companies at present propose to build global carriers' carrier networks: Global Crossing and Level 3 Communications. Global Crossing is a Bermuda based telecommunications company which currently has three operational cable systems: Atlantic–Crossing–1 (AC–1), Pacific–Crossing (PC–1) and Pan–European Crossing (PEC). Global Crossing is currently building a number of other systems covering Asia (Asia Global Crossing) and Latin America (SAC, MAC and PAC). We believe we compete with Global Crossing on quality, as well as on the coverage and cost effectiveness of our network. Level 3 Communications currently operates a United States city-to-city cable network based on company owned infrastructure and is building a European city-to-city network. Level 3 Communications has announced the construction of a single, high capacity cable cross [sic] the Atlantic Ocean. Level 3 has made investments in a trans-Pacific cable system (US–Japan) in addition to its own facilities.

Over time, as we develop our wholesale services offerings, we expect to compete with major global telecommunications operators such as MCI WorldCom and British Telecom/AT & T. These companies primarily focus on offering services to multinational corporations, although they also offer carriers' carrier services. Such companies often participate in consortium cable projects, as well as in private network systems, such as those we own and operate. We also expect to face competition from carriers' carriers and incumbent regional telecommunications providers with respect to our wholesale service offerings.

TRANS–ATLANTIC SERVICES COMPETITORS

We believe our key competitors in the trans-Atlantic services market are as follows:

— TAT–14—This loop cable system is a consortium system cable sponsored by British Telecom, AT & T and other incumbent telecommunications operators in the United States and Europe. It has a maximum design capacity of 640 gigabits per second. TAT–14 provides services on a coast-to-coast basis. It does not presently provide city-to-city services.

— LEVEL 3 COMMUNICATIONS—Level 3 Communications is building a single cable system based on IP only technology, running at 1.28 terabits per second. The system provides city-to-city service.

— GLOBAL CROSSING AC–1 AND AC–2—AC–1 is a loop system across the Atlantic. AC–1 runs at 80 gigabits per second and may be subsequently upgraded to 160 gigabits per second. AC–1 is fully operational. AC–2 is a proposed 2.56 terabits per second single cable system that, due to its increased capacity over AC–1, would only partially restore on AC–1. AC–2 is at an early stage of development.

— HIBERNIA—This is a proposed 1.92 terabits per second system which is sponsored by Worldwide Fiber, a subsidiary of Ledcor Industries, a Canadian mining company. Worldwide Fiber principally offers dark fiber connectivity on terrestrial networks on a carriers' carrier basis in the North American markets.

INTRA–EUROPEAN SERVICES COMPETITORS

We believe that the intra-European market will become very competitive in the next 12–18 months as a result of the large number of proposed pan-European

operators. At least eight pan-European networks have been announced or commenced operations, including: GTS, BT Farland, MCI WorldCom Ulysses, Alcatel/The Petabit Network, iaxis, Global Crossing PEC, Viatel Circe and KPN/Qwest.

MIDDLE EASTERN TRANSMISSION SERVICES COMPETITORS

We expect to compete against two primary competitors in this market:

— SEA ME WE (SMW3)—This is a consortium cable system that connects the Asia/Pacific region via the Middle East to Western Europe along a similar route to the Flag Europe–Asia cable system. SMW3 was originally planned to route to the FLAG Europe–Asia cable system. SMW3 was originally planned to be in service in late 1997; however, it was significantly delayed and only recently entered commercial service. SMW3 has an initial capacity of 20 gigabits per second and is upgradeable to 40 gigabits per second. SMW3 has major investors that include many of the incumbent telecommunications operators along its route.

— Satellite—In addition to the SMW3 cable, carriers have the alternative of transmission by satellite, including existing geosynchronous satellites and low earth orbit systems now under construction. In general, satellite service is considered to be of inferior quality, because time delays and echos affect transmission, and service interruptions are more frequent. Furthermore, satellite systems are more expensive to launch and to maintain per circuit and generally have a shorter useful life and less capacity. Nonetheless, there are many communications satellites in geosynchronous orbit which are available to provide service.

ASIA/PACIFIC REGIONAL TRANSIT COMPETITORS

At present, two other systems compete in the Asia/Pacific market, SMW3 and APCN. Both are consortium systems.

— SMW3—in Asia, this system connects from Singapore north through Asia to Japan, and also south to Australia.

— APCN—This consortium system is an established regional transit system around Asia. Many of the region's traditional operators are participants.

In addition, several further systems are planned that may come into service between 2001–2003. These include APCN2, backed by incumbent Asian operators, PA–1, backed by NTT and U.S. and European operators, and a system proposed by Global Crossing.

EUROPE–ASIA LONG HAUL SERVICES COMPETITORS

We also participate in the Europe–Asia long haul market through the FLAG Europe–Asia cable system. SMW3 is the primary direct competitor along this route. However, we expect the strongest competition in the future to come from an alternative routing from Europe to Asia across the Atlantic Ocean, trans-US, and across the Pacific Ocean to Japan.

(*Id.* at 52–54.)

Finally, in Management's Discussion and Analysis Flag stated:

Because capacity sales recognized as revenues in 1997 were generally sold at a higher price per unit than the price per unit we expect to realize in the future, we have recognized a higher cost of sales per unit in 1997 than we expect to recognize in the future based on management's current best estimate and

third party market forecasts of capacity sales. (*Id.* at 31.)

### C. *The Allegedly Misleading Statements or Omissions in the Prospectus Concerning Capacity Pre–Sales*

Plaintiff alleges that the disclosures in the Prospectus concerning capacity pre-sales on the FA–1 system were materially false or misleading. (3CAC ¶ 92.) According to plaintiff, Alcatel Submarine Networks ("Alcatel") entered into an improper agreement with Flag (the "Alcatel Sales Agreement") for the purchase of capacity on the FA–1 system. The Alcatel Sales Agreement, plaintiff alleges, was entered into as part of a "fraudulent scheme" to inflate FA–1 system pre-sales to create the illusion that there was demand for capacity on the FA–1 system and to secure a line of credit necessary for the construction of the FA–1 system. (*Id.* ¶¶ 91–92, 98.)

## II. *Post–IPO Events*

### A. *The Allegedly False or Misleading Statements*

Plaintiff contends that subsequent to Flag's IPO, Flag's market position continued to deteriorate, but rather than reveal the company's troubles, the Flag defendants issued false statements and financial results in press releases and SEC filings to give the impression that Flag was a sound company that "always met or exceeded the market's expectations." (*Id.* ¶ 8.) Plaintiff contends that the following statements made by Flag, McCormack and Bande after the company's IPO were false or misleading.

On March 3, 2000, Flag issued a press release announcing its financial results for FY:99. Flag reported Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $128 million and gross revenues of $162 million. Although gross revenues were down from $208 million in 1998, Flag explained that "[r]eported revenue trends reflected the requirement to defer some revenues to subsequent periods for accounting purposes as a result of . . . [the adoption of FASB Interpretation No. 43] and the inclusion of non-cash items in 1998 reported revenues." (*Id.* ¶ 99.) In Flag's 10–K report filed on March 30, 2000, which was signed by Bande and McCormack, the company repeated the gross revenue disclosures and added that Flag "recognized revenue from the sale of capacity of $120.2 million." (*Id.* ¶ 100.)

In a press release issued on March 20, 2000, Bande commented on a capacity sale that involved Saudi Telecommunications Company stating: "We believe the size of capacity purchased underlines the importance of fiberoptic cables in today's bandwidth hungry market, and the confidence of Saudi Telecom in Flag Telecom to deliver robust service." (*Id.* ¶ 102.) Shortly thereafter, Flag announced plans to build the Flag Pacific–1 system without disclosing the glut of supply that was allegedly already on the market. (*Id.* ¶ 103.)

On April 26, 2000, Flag issued a press release announcing its financial results for 1Q:00 which ended March 31, 2000. (*Id.* ¶ 106.) The company noted that it had EBITDA of $46.3 million and that "[s]trong global demand for data/IP bandwidth drives cash revenue growth. . . . The results reflect continued strong demand for bandwidth, both in the form of capacity sales and short-term leases." (*Id.*) Bande stated: "The strength of our results underscores the continuing growth in global demand for higher bandwidth capacity." (*Id.*) McCormack added that Flag's strong cash position "together with presales of network capacity and non-recourse bank debt, should fully fund our current business plan." (*Id.*) In Flag's 10–Q report for

this quarter, which was signed by McCormack, the company reported total revenue for the quarter of $19.2 million and revenue from the sale of capacity of $7.8 million. The company sustained a net loss of $31.1 million for the quarter. Although these results represented a downward departure from 1Q:99, Flag attributed the less favorable figures "primarily to reduced accounting revenue and increased depreciation costs caused by the adoption of FASB Interpretation No. 43." (*Id.* ¶ 110.)

On May 16, 2000, Flag filed a Registration Statement for an exchange offer in connection with certain notes it had privately issued in March 2000. This filing did not disclose adverse market trends of which the Flag defendants were allegedly aware. (*Id.* ¶ 109.)

On July 25, 2000, Flag issued a press release announcing its financial results for 2Q:00 which ended June 30, 2000. (*Id.* ¶ 12.) The company announced that it recorded EBITDA of $1.8 million and stated that "[t]he move of EBITDA to positive territory comes a year ahead of Company expectations, reflecting both strong sales and cost containment." (*Id.*) In Flag's 10–Q report for 2Q:00, which was signed by McCormack, Flag reported total revenues of $24.7 million and revenues from the sale of capacity of $10.2 million. (*Id.* ¶ 115.)

On October 24, 2000, Flag issued a press release announcing it's results for 3Q:00 which ended September 30, 2000. Flag stated in the release that it recorded EBITDA of $1.8 million for the quarter and commented that "[t]he results show a continuing successful execution of the company's strategy to meet the global growth in demand for IP capacity and value added services." (*Id.* ¶ 117.) In the company's 10–Q report filed for the quarter, which was signed by McCormack, Flag reported total revenue of $24.7 million and revenue from sales of capacity of $10.2 million. (*Id.* ¶ 115.)

On October 31, 2000, Flag announced in a press release that it had agreed to purchase GTS's interest in the FA–1 system. Bande stated:

> The FA–1 system will support our fast developing network services business, delivering IP and network services across our global platform for carriers, ASPs and ISPs. Demand for capacity across the Atlantic continues to grow, and this agreement enables FLAG to increase its ownership of highly resilient capacity, and at a very attractive cost base.

(*Id.* ¶ 122.) Subsequent to the completion of the purchase of GTS's interest, Bande made the following statement in a press release:

> The competitive landscape on this route is also encouraging. Market prices appear to have stabilized over the past two quarters and continue to be in line with our expectations. In particular, the number of competing systems we had expected has declined after the combination of two market players on to one cable system.

(*Id.* ¶ 123.)

On February 6, 2001, Flag issued a press release announcing its FY:00 results. Flag stated that "[c]ontinued growth in demand for bandwidth and Network Services was the driver behind the strong performance during the year." (*Id.* ¶ 126.) McCormack stated: "We have seen continued demand for our traditional capacity and Network Services products in the fourth quarter, taking our cumulative sales to date over $2.0 bn." Bande added the following:

> We expect our results for 2001 to reflect continued growth in sales of capacity on our two completed systems, presales on systems under development and further

progress in our FNS business. We anticipate seeing continued strong interest from our traditional customer base as well as from new categories of customers whom we are reaching with our expanding range of Network Services.

(*Id.*) In Flag's 10–K for FY:00, which was signed by Bande and McCormack, the company reported total revenue of $99.3 million, revenue from the sale of capacity of $36.8 million and EBITDA of $2 million. (*Id.* ¶ 127.)

On March 5, 2001, Flag issued a press release announcing "that in response to market demand [Flag] is bringing forward the planned upgrade programme for the . . . [FA–1] cable system." McCormack stated: "Following sales commitments and indications of future demand across this high-traffic route, we have accelerated the timing of the upgrade of our capacity on FA–1." (*Id.* ¶ 132.)

On April 24, 2001, Flag issued a press release announcing its financial results for 1Q:01 which ended on March 31, 2001. Bande stated in the release that "[d]emand across the network routes remains strong." (*Id.* ¶ 170.) This statement from Bande appears to be the last occasion on which a Flag defendant represented to the public that market demand for broadband telecommunications capacity was strong. In Flag's Form 10–Q for 1Q:01, which was signed by McCormack, the company reported total revenues of $29 million, a 51% increase from 1Q:00, revenue from sales of capacity of $8.1 million, a 4% increase from 1Q:00, and EBITDA of $1.2 million. (*Id.* ¶ 171.)

On August 7, 2001, Flag issued a press release announcing its financial results for 2Q:01 which ended June 30, 2001. In that release, McCormack stated the following:

> While the current market conditions remain challenging, we find increasingly that customers are looking for the quality, flexibility of routing, rapid turn-up

and certainty of supply that the FLAG Telecom network can provide. Going forward, we expect to benefit from marketing capacity and Network Services products across the elements of our network currently in service, and to experience continued demand from our strong traditional customer base as well as from new customers.

(*Id.* ¶ 176.) In Flag's Form 10–Q for 2Q:01, which was signed by McCormack, Flag reported total revenues of $36.1 million, a 46% increase from 2Q:00, and EBITDA of $2.8 million. (*Id.* ¶ 177.)

On November 6, 2001, Flag issued a press release announcing its results for 3Q:01, which ended September 30, 2001, wherein Bande stated the following:

> We had a good quarter, remaining in line with our guidance and continuing to see the benefits of our focused approach to the business. FLAG Telecom remains a fundamentally sound company. Clearly, our ability to deliver revenue growth and meet our targets in challenging market conditions is a direct result of the competitive advantages and unique reach of our global network, the quality and stability of our customer base and the high levels of service we are able to provide to those customers. . . . [W]e believe we are well positioned in the global economic downturn and should stand to benefit from any market recovery in the future.

(*Id.* ¶ 179.) Flag reported in the release that total cumulative revenues through the third quarter of 2001 were $723.9 million and that adjusted EBITDA was $612.7 million. This represented a substantial increase from the prior year. The company also stated that total revenues for 3Q:01 were $55.6 million and that it had enjoyed a "[s]trong cash position of $668.8m." (*Id.* ¶ 179.)

## B. *Flag Announces That It Is Reviewing Its Business*

On February 13, 2002, Flag issued a press release announcing its financial results for FY:01. Flag revealed the following:

> We believe that our available sources of cash provide sufficient liquidity to fund our obligations and our ongoing business operations throughout 2002. We are currently reviewing our business in the light of deteriorating market conditions. If there is no improvement in our operating environment, we anticipate that at some point in 2003 we will not have sufficient liquidity to continue our operations, unless we are able to raise additional funds, find a strategic partner or restructure our indebtedness.
>
> Given the state of the capital markets generally, and especially for our industry sector, we think it is unlikely that we will be able to raise additional debt or equity capital under current market conditions. In connection with our review of our liquidity and capital resources, our desired capital expenditures and the current capital market conditions for companies in our sector, we have initiated discussions with potential strategic partners and potential financial advisors. In these discussions we are considering the impact on our industry sector of the insolvency of various industry participants, lower margins resulting from the amount of distressed assets in the marketplace, the current state of capital markets for companies in our industry sector, our liquidity and capital resources, and possible financing and strategic alternatives.

(*Id.* ¶ 187.) Flag also revealed in this release that "14% of GAAP revenues for the full year 2001 was associated with reciprocal transactions entered into with other telecommunications companies and service providers." (*Id.*) Subsequent to the issuance of this press release, Flag's stock declined 46% to $0.36 a share on heavy volume. (*Id.* ¶ 190.)

In Flag's 10–K for FY:01, filed on April 1, 2002, the company disclosed that it would not be able to "make the required interest payments, due March 30, 2002, on ... [certain] outstanding senior notes." (*Id.* ¶ 192.) Flag also revealed the following:

> Given the high degree of competition in terms of alternative supply, price erosion and continued lack of demand on the trans-Atlantic route ... we now believe that the asset value of our FA–1 system is impaired. We determined that the carrying value of the FA–1 system exceeded its fair value and we have therefore recognized an impairment charge of $359.0 million in the year ended December 31, 2001.

(*Id.* ¶ 192.) However, Flag noted, "at this time we do not believe that the FEA system is impaired." (*Id.* ¶ 198.)

Flag filed a Chapter 11 bankruptcy petition on April 12, 2002. During these proceedings Flag prepared a "Pro-forma Reorganized Balance Sheet as of September 30, 2002." (3CAC ¶ 199.) According to plaintiff, the balance sheet indicated that the estimated value of Flag's property and equipment was $385 million. Flag had reported in its financial results for 3Q:01 that its property and equipment were worth $2.3 billion. (*Id.*)

Several lawsuits asserting claims under the federal securities laws were filed against Flag, the individual defendants, Citigroup and Verizon in the Spring of 2002. This Court consolidated these actions and appointed Loftin lead plaintiff. Plaintiff subsequently filed a 2CCAC and the individual defendants, Citigroup and Verizon moved to dismiss the 2CCAC. In *Flag I*, this Court dismissed the 2CCAC but granted plaintiff leave to replead his

claims. 308 F.Supp.2d at 252. Plaintiff subsequently filed the 3CAC and defendants now move to dismiss the 3CAC.

## DISCUSSION

### I. *Standard of Review*

On a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States,* 82 F.3d 23, 26 (2d Cir.1996) (quoting *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 JAMES WM. MOORE ET. AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed.1997); *see also Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 (2d Cir.1995). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law. *See Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978).

In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference, *see* FED. R. CIV. P. 10(c);

*De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir.1996), and documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 46–48 (2d Cir.1991). A company's prospectus is integral to a plaintiff's § 11 and § 10(b) claims and can be considered in its entirety even where plaintiff has quoted from it sparingly. *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d. Cir.1991). Indeed, when considering a motion to dismiss § 11 claims, the court must consider the prospectus as a whole. *Olkey v. Hyperion,* 98 F.3d 2, 5 (2d Cir.1996).

### II. *Whether Plaintiff's Claims Against Flag Were Timely Filed*

■ Flag contends that plaintiff's claims brought under § 11 and § 12(a)(2) of the Securities Act are time-barred because plaintiff failed to commence suit on these claims within "three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. Flag also argues that plaintiff's § 10(b) and Rule 10b–5 claims against it are time-barred because plaintiff failed to commence suit "within one year after the discovery of the facts constituting the violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) *overruled on other grounds by* § 27A of the Securities and Exchange Act.

On April 2, 2002, *Michel–Garcia v. Flag Telecom Holdings, Ltd.,* 02 Civ. 2541(WCC) was filed in this Court naming, *inter alia,* Flag as a defendant and asserting claims under the Exchange Act. Shortly thereafter, *Kurtz v. Flag Telecom Holdings, Ltd,* 02 Civ. 2767(WCC) (S.D.N.Y.) (filed Apr. 9, 2002), *Mehan v. Flag Telecom Holdings, Ltd,* 02 Civ. 3023(WCC) (S.D.N.Y.) (filed Apr. 19, 2002), *Kane v. Flag Telecom Holdings, Ltd.,* 02 Civ.

3314(WCC) (S.D.N.Y.) (filed Apr. 29, 2002), and *McNeely v. Flag Telecom Holdings, Ltd.*, 02 Civ. 3234(WCC) (S.D.N.Y.) (filed Apr. 26, 2002), were filed. The plaintiffs in these actions also named Flag as a defendant and asserted claims under the Exchange Act.

On May 1, 2002, Loftin filed a Class Action Complaint (the "May 2002 Complaint") on behalf of purchasers of Flag's stock during the class period. *Loftin v. Bande*, 02 Civ. 3400(WCC) (S.D.N.Y.) (filed May 1, 2002). In the May 2002 Complaint, plaintiff asserted Exchange Act and Securities Act claims and named as defendants, *inter alia*, the individual defendants, Citigroup and Verizon. (May 2002 Complaint ¶¶ 7–14, 61–89.) Plaintiff noted in the May 2002 Complaint that Flag had not been named because it had filed a Chapter 11 bankruptcy petition on April 12, 2002. (*Id.* ¶ 6.) On October 18, 2002, we consolidated *Loftin, Michel–Garcia, Kurtz, Mehan, McNeely* and *Kane* by Order and named Loftin lead plaintiff (the "Consolidation Order"). Around the time that the Consolidation Order was issued, *Michel–Garcia, Kurtz, Mehan, McNeely* and *Kane* were voluntarily dismissed without prejudice with respect to Flag only. (Fortinsky Decl., Ex. T.) On December 18, 2002, we "So Ordered" a stipulation signed by the attorney for the individual defendants, who also currently represents Flag and represented FTGL when FTGL was a party to this action, captioning the action *In re Flag Telecom Holdings, Ltd, Securities Litigation* (the "December 2002 Order"). (*Id.*) Counsel for the individual defendants signed the stipulation that later became the December 2002 Order solely in his capacity as attorney for the individual defendants. The December 2002 Order

also provided that plaintiff was to serve a Consolidated Amended Complaint ("CAC") by January 16, 2003. (*Id.*) The time to serve the CAC was subsequently extended by Order on two other occasions (the "Extension Orders") but Flag was never a party to the Extension Orders.

Flag's Plan of Reorganization (the "Plan") was approved by the bankruptcy court on September 26, 2002 and Flag's reorganized successor, FTGL, emerged from bankruptcy on October 9, 2002. The Plan discharged Flag's direct liability for violations of the federal securities laws but provided that

> the discharge ... shall not prohibit holders of security-related Claims against [Flag] ... from asserting such Claims solely for the purpose of accessing, and to the extent of, any applicable insurance policies, *provided however*, that [neither Flag nor FTGL] ... shall have any direct liability on account of any such claims exclusive of such insurance policies.

(Fortinsky Decl. ¶ 3(e).) [5]

On March 20, 2003, plaintiff filed the CAC and described Flag as follows: "Defendant Flag Telecom Group Limited is the re-organized successor of Flag Telecom Holdings Limited (collectively 'FLAG')." (CAC ¶ 43.) Plaintiff also named as defendants, *inter alia*, Citigroup, Verizon and the individual defendants. (*Id.* ¶¶ 44–56.) In July 2003, FTGL, along with the individual defendants, Citigroup and Verizon moved to dismiss the CAC and counsel for FTGL informed plaintiff that FTGL did not hold title to the policies at issue and was not the proper party. (Fleishman Decl. ¶¶ 2–3.) On November 12, 2003, before FTGL's motion to dismiss

---

5. In *Flag I,* we held that although Flag's direct liability under the federal securities laws was discharged under the Plan, this language authorized plaintiff to institute an action in district court against Flag to recover any applicable insurance proceeds. 308 F.Supp.2d at 252 n. 3.

was fully submitted, plaintiff filed a Second Corrected Consolidated Amended Complaint ("2CCAC") for the sole purpose of naming Flag as a defendant instead of FTGL. In considering the motions to dismiss, we treated FTGL's submissions in support of its motion as if they had been filed by Flag. *Flag I,* 308 F.Supp.2d at 252 n. 2. However, during the March 2004 conference the parties informed the Court that Flag had yet to be served with a consolidated complaint in this action. Counsel for plaintiff informed the Court that she had been unable to serve Flag because counsel for Flag denied that he was representing Flag. Counsel for Flag informed the court that he had not been retained by Flag and that, as of the date of the conference, he only represented FTGL and the individual defendants. The Court advised counsel for plaintiff that she should serve Flag's bankruptcy counsel, Millbank, Tweed, Hadley & McCloy, and that if Flag's bankruptcy counsel refused service the Court would take the appropriate action.

The 3CAC provides factual allegations indicating that Flag's investors were placed on inquiry notice of their claims against Flag by February 13, 2002. Indeed, on that date, plaintiff contends, Flag "stunned the market" when it admitted "that 14% of Flag's 2001 GAAP revenues were based on reciprocal transactions, and that the Company was likely to be forced to discontinue operations in 2003." (3CAC ¶ 187.) Accordingly, plaintiff's Securities Act claims were required to be filed on or before February 16, 2003, three years after Flag's IPO, 15 U.S.C. § 77m, and his Exchange Act claims against Flag were required to be filed on or before February 13, 2003.[6] *Lampf, Pleva, Lipkind, Prupis & Petigrow,* 501 U.S. at 364, 111 S.Ct. 2773. Plaintiff did not attempt to name Flag or FTGL as a defendant until he filed his CAC on March 20, 2003,[7] more than one month after the applicable statute of limitations and statute of repose had run.

Plaintiff contends that the amendment adding Flag as a party should relate back to the filing of his May 2002 Complaint. Rule 15(c) provides that an amendment to a complaint adding a party will relate back to the date of the filing of the original complaint when

the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading ... and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has re-

6. The filing of a bankruptcy petition, which serves to stay litigation against the debtor, does not toll the applicable statute of limitations. *See Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1073 (2d cir.1993). However, if a limitations period expires while litigation against the debtor is stayed, the plaintiff's time for filing suit is extended until thirty days after notice of the termination of the bankruptcy stay. 11 U.S.C. § 108(c). Section 108(c) is not implicated in the present action because the relevant statute of limitations and statute of repose did not expire until after the bankruptcy stay was terminated.

7. For the purposes of this motion, we will assume that Flag was named properly as a defendant in the CAC filed on March 20, 2003. However, no consolidated complaint was served upon Flag until this Court, during the March 2004 conference, directed counsel for plaintiff to serve Flag's bankruptcy counsel. Accordingly, Flag did not appear in this action until after the 3CAC was filed. Plaintiff does not contend that Flag waived its statute of limitations defense by failing to raise it in opposition to the 2CCAC. (Pl. Mem. Opp. Mot. Dismiss at 47.) Indeed, such a position would seem unsupportable because neither the 2CCAC nor any other consolidated complaint filed in this action was served upon Flag prior to March 2004.

ceived such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

FED. R. CIV. P. 15(c).

Although Flag had notice of the commencement of this action, plaintiff has not shown that Flag "knew or should have known that, but for a mistake concerning the identity of the proper party the action would have been brought against that party" before the expiration of the limitations period. *Id.* Indeed, the record demonstrates that, although Flag was named as a defendant in *Michel–Garcia, Kurtz, Mehan, McNeely* and *Kane,* plaintiff made a conscious decision to discontinue those actions insofar as they raised claims against Flag. Presumably, plaintiff caused these actions to be dismissed because he believed it was necessary to ensure that the bankruptcy stay applicable to litigation involving Flag did not interfere with the progress of his suit against Citigroup, Verizon and the individual defendants.[8]

Plaintiff contends that he failed to name Flag "because of confusion—a confusion affirmatively *encouraged* by defense counsel and counsel for [Flag's] Joint Provisional Liquidators—concerning which Flag entity held the insurance policies post-bankruptcy." (Pl. Mem. Opp. Mot. Dismiss at 43.) However, plaintiff does not contend that there was any confusion as to the identity of the proper party prior to the filing of the CAC on March 20, 2003.

Plaintiff contends only that he became aware in July 2003 of the possibility that he had named FTGL in error. (*Id.* at 46; Fleishman Decl. ¶ 2.) The fact that plaintiff may have been confused as to the identity of the proper party until July 2003 is immaterial because *neither Flag nor FTGL* had been named on or prior to February 13, 2003, the date the statute of limitations ran on plaintiff's Exchange Act claims, or on or prior to February 16, 2003, the date the statute of repose ran on plaintiff's Securities Act claims. Moreover, the defendants' acts that plaintiff contends encouraged plaintiff's confusion occurred several months after FTGL and Flag had been named. (Fleishman Decl. ¶ 2, Ex. 2.)

Accordingly, we conclude that plaintiff's failure to amend the May 2002 Complaint prior to the expiration of the relevant limitations period to add Flag or FTGL as a defendant was not caused by a mistake concerning the identity of the proper party. Plaintiff made a strategic decision to dismiss the claims filed against Flag in *Michel–Garcia, Kurtz, Mehan, McNeely* and *Kane* and continued to pursue this tactic until after the expiration of the limitations period. Thus, plaintiff's March 20, 2003, amendment adding Flag does not relate back to the filing date of the initial pleading under Rule 15(c), *see Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994), and we grant Flag's motion to dismiss as untimely all the claims raised against it in the 3CAC.

## III. *Plaintiff's § 11 Claims*

Plaintiff asserts claims under § 11 of the Securities Act against the individual defen-

8. We note that the automatic stay under 11 U.S.C. § 362 does not apply to non-bankrupt co-defendants. *See Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 288 (2d Cir.2003). Absent "special circumstances," when an action is commenced against a corporation and its officers and the corporation subsequently files a bankruptcy petition, the plaintiff may pro-

ceed against the officers even though the action is stayed with respect to the debtor corporation. *See Gucci America, Inc. v. Duty Free Apparel,* 328 F.Supp.2d 439, 441–442 (S.D.N.Y.2004), 2004 U.S. Dist. LEXIS 16002, *5–7; In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 480 n. 1 (S.D.N.Y.2004) (Conner, J.).

dants and Citigroup. In order to state a claim under § 11, a plaintiff must allege that "the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading ...." 15 U.S.C. § 77k(a). The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective. *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 923 (D.N.J.1998). A claim under this section may be asserted against, *inter alia,* every person who signed the registration statement, the directors of the issuer and the underwriter of the security. 15 U.S.C. § 77k(a).[9] The test for determining whether the prospectus contained material misstatements or omissions is "whether the defendants' representations [made in the prospectus], taken together and in context, would have misled a reasonable investor ...." *Olkey,* 98 F.3d at 5 (citations omitted).

**A.** *The Allegedly False or Misleading Statements in the Prospectus Concerning Demand*

■ Plaintiff contends that the following statements in the Prospectus concerning demand for broadband telecommunications capacity were false as of the effective date of the Registration Statement:

We developed and are enhancing the FLAG Telecom network and our product and service offerings to participate in the following important growth and strategic shifts in the international telecommunications markets: ...

RAPID GROWTH OF TELECOMMUNICATIONS TRAFFIC. According to an August 1999 research report published by Ovum Ltd., total world telecommunications traffic demand is expected to grow more than 50-fold between 1999 and 2005, with Internet and data traffic accounting for 98% of total traffic by 2005....

IMPACT OF GLOBAL DEREGULATION. The continued deregulation of the global telecommunications industry has resulted in a significant increase in the number of competitors, including traditional carriers, wireless operators, Internet service providers and new local exchange service providers. This change in the global competitive landscape is generating significant demand for broadband telecommunications capacity as carriers seek to secure sufficient capacity for their expansion plans.... Global deregulation has also resulted in increased demand for city-to-city services, as new entrants to the telecommunication industry seek to take advantage of the economic benefits of controlling facilities on an end-to-end basis.

(Registration Statement at 39–40; 3CAC ¶ 80.) In a section of the Prospectus labeled "Our Products and Services," Flag stated the following: "We offer packages of circuits with delivery staged over time; this allows our customers' capacity to grow in time with anticipated demand growth." (Registration Statement at 43; 3CAC ¶ 80.)

Upon reviewing these statements, we conclude that Flag represented in the Prospectus that there was "significant demand for broadband telecommunications capacity" at the time of the company's IPO and that demand was expected to grow in the future. Plaintiff has not pled facts demonstrating that these statements were false as of the Effective Date.

---

9. Defendants Evans and Bautista were not Flag directors at the time of the IPO or signatories to the Registration Statement. Accordingly, plaintiff's § 11 claim against Evans and Bautista are dismissed with prejudice.

Plaintiff contends that because he has alleged that prices declined by at least 70% on the trans-Atlantic route in the year prior to Flag's IPO, (3CAC ¶¶ 82–83,) he is "entitled to the benefit of a reasonable inference in this regard." (Pl. Mem. Opp. Citigroup's Mot. Dismiss at 7.) Allegations of precipitous price declines in the year prior to a company's IPO may tend to show that a company falsely stated in a prospectus that prices had been trending upwards prior to the IPO. The same allegations, however, do not demonstrate that generalized statements regarding market demand were false as of the effective date of the registration statement. Indeed, prices may fall for a variety of reasons unrelated to demand especially where there is substantial competition in the relevant market. Moreover, industries that utilize advanced technologies, such as the telecommunications industry, may experience price declines when technological advances allow for more efficient production or transmission processes.

Similarly, plaintiff argues that the fact that Flag had been able to sell only 5% of its capacity on the FEA system supports the inference that demand for broadband telecommunications capacity was stagnant and not growing as of the Effective Date. We disagree. First, the FEA system had a useful life of approximately 25 years. (Registration Statement at 48.) It would be unreasonable to presume that the capacity on that system would be purchased soon after the system was placed into service or not at all. Second, the Prospectus revealed that Flag hoped to participate in the "growth" that it and others expected to occur in the telecommunications industry. The fact that Flag had so much capacity available on its FEA system was consistent with its strategy to profit from the predicted explosion in telecommunications traffic.

Plaintiff argues that on a motion to dismiss we must "make all reasonable inferences in [his] favor." (Pl. Mem. Opp. Citigroup's Mot. Dismiss at 9.) Thus, we must sustain his allegations because it is reasonable to conclude that the price declines that occurred prior to Flag's IPO were caused by a lack of demand. (Id.) Although, on a motion to dismiss we must view the facts alleged in the 3CAC in the "light most favorable to the plaintiff," see Scheuer, 416 U.S. at 236, 94 S.Ct. 1683, we are not required to take every inferential leap suggested by plaintiff. In Rombach v. Chang, the plaintiffs alleged that the defendants' optimistic statements concerning their company were misleading because those statements were made when the company faced a liquidity crisis. 355 F.3d 164, 173–74 (2d Cir.2004). The complaint contained allegations tending to show that the defendants' statements were made when the company had failed to pay certain creditors, execute certain projects and integrate certain newly acquired properties. Id. at 173. The Second Circuit held that these allegations were insufficient to plead falsity because "the allegations in the complaint are consistent with unremarkable circumstances short of financial peril or instability." Id. at 173–74. The court noted: "A company that operates 119 separate facilities nationwide is bound to have problems assimilating this or that property, to have disputes over payments with vendors and landlords, and to have some bills unpaid by reason of contested amounts or spot episodes of illiquidity." Id. at 173. In the present case, we have accepted as true plaintiff's factual allegations concerning price declines and sales on the FEA system. However, we conclude that these factual allegations are entirely consistent with conditions other than lack of demand for broadband telecommunications capacity or a belief within Flag that demand would not grow in the

future. Therefore, plaintiff has failed to allege that the above cited statements were false as of the Effective Date.[10]

██ Plaintiff argues that Flag's representations in the prospectus that "telecommunications traffic demand is expected to grow more than 50–fold between 1999 and 2005" and other optimistic statements concerning the potential for growth in telecommunications traffic were false or misleading because, as of the Effective Date, Flag was in possession of a report (the "Little Report") prepared by Arthur D. Little Inc. ("Arthur Little") which concluded: (1) supply would outstrip demand through 2006; (2) interviews with carriers who had purchased capacity on competing trans-Atlantic cables revealed that they did not "expect to need additional capacity for the next 3 to 4 years"; and (3) carriers generally expected prices for broadband telecommunications capacity to decline for a "few" years following the IPO. (*Id.* ¶ 84.) Although Flag never mentioned the Little Report in the Prospectus, no reasonable investor would have been misled by Flag's citation of a research report indicating 50–fold growth between 1999 and 2005 or Flag's optimistic statements regarding the potential for future growth in telecommunications traffic. The Prospectus, when read as a whole, informed investors that Flag faced stiff competition and pricing pressures from more established telecommunications operators and contained sufficient cautionary language to warn investors of the relevant risks.

The Prospectus contained extensive cautionary language, the relevant portions of which are quoted *supra* in the Background Section Part I.B. Flag stated in no uncertain terms that "WE FACE COMPETITION AND PRICING PRESSURE FROM A WIDE VARIETY OF SOURCES." Flag then described in detail the competition it faced on each of its routes. If a reasonable investor had read these disclosures he would have been alerted to the fact that Flag was only one of a number of companies that wished to sell broadband telecommunications capacity in various markets throughout the world. Indeed, Flag disclosed that the FA–1 system would have to compete with: (1) TAT–14, an established system created by "British Telecom, AT & T and other incumbent telecommunications operators in the United States and Europe"; (2) Global Crossing's AC–1 cable; (3) a cable that, at the time of Flag's IPO, Level 3 Communications was constructing; (4) AC–2, a cable proposed by Global Crossing; and, (5) Hibernia, a cable proposed by Worldwide Fiber. (Registration Statement at 53.) Armed with these facts, a reasonable investor should have concluded that, although there was substantial demand for broadband telecommunications capacity on the trans-Atlantic route and demand was expected to grow as the Internet grew, there were a number of companies, some better established than Flag, that endeavored to meet this need for capacity.

The Prospectus also revealed that Flag expected the intra-European market to "become very competitive" after Flag's IPO "as a result of the large number of proposed pan-European operators." (*Id.*)

---

10. It would be exceedingly difficult to plead the falsity of comparative statements such as "there is significant demand" or "there is strong demand" within a particular industry or market. Moreover, even if a plaintiff were able to allege the falsity of such qualitative statements concerning demand in a particular industry, the statements are likely to be considered immaterial. *See Schoenhaut v. Am. Sensors, Inc.*, 986 F.Supp. 785, 791 (S.D.N.Y. 1997) ("The phrase 'continued strong demand' is not, however materially false and misleading because it does not convey any material information.... [R]ather, it constitutes nothing more than a vague assertion on which no reasonable investor would rely.").

On the Middle Eastern route Flag stated that it faced competition from a consortium cable system built by incumbent telecommunications operators and from satellite providers. (*Id.* at 53.) On the Asia–Pacific route, Flag disclosed that it faced competition from incumbents and that several new cables were expected to come into service. (*Id.* at 54.) Finally, Flag expected to face competition on the Europe–Asia "long haul route" from an incumbent operator and, most significantly, "alternative routing from Europe to Asia across the Atlantic Ocean, trans-US, and across the Pacific Ocean to Japan." (*Id.*)

█ Flag also indicated in the Prospectus that competition among telecommunications operators had resulted in pricing pressure and prices were likely to decline going forward. Under the heading "RISK DISCLOSURES" Flag stated, "WE FACE COMPETITION AND PRICING PRESSURE FROM A WIDE VARIETY OF SOURCES." (*Id.* at 11.) In Management's Discussion and Analysis discussing previous years financial results Flag stated:

> Because capacity sales recognized as revenues in 1997 were generally sold at a higher price per unit than the price per unit we expect to realize in the future, we have recognized a higher cost of sales per unit in 1997 than we expect to recognize in the future based on management's current best estimate and

third party market forecasts of capacity sales. (*Id.* at 31.) [11] Flag thus clearly disclosed that it expected prices for broadband telecommunication capacity to decline. In the "BUSINESS" section of the prospectus under the heading "WE PROVIDE SUPERIOR CUSTOMER SERVICE" Flag disclosed that its "marketing and sales personnel ... will seek to maintain ongoing communication with customers and market sources in order to adapt pricing and product structures to changed conditions and changed competitive pressures." (*Id.* at 45.) In the same section under the heading "MARKETING AND SALES" Flag stated: "We are committed to an ongoing market review ... with a view to price adjustments and incentive discounts which will attract carriers and other telecommunications companies to the FLAG Telecom network." (*Id.* at 51.)

Plaintiff appears to intimate that the Prospectus led investors to conclude that Flag was a good investment because there was not enough capacity to meet the projected growth in demand for telecommunications capacity. However, as a whole, Flag's disclosures could not have reasonably given investors that impression. Flag made a few relatively innocuous statements regarding demand for telecommunications capacity at the time of the company's IPO and some optimistic statements concerning the growth in demand for broadband telecommunications capacity

---

11. Plaintiff argues that we should decline to consider this disclosure because it does not appear in the "RISK DISCLOSURES" section of the Prospectus but instead appears "buried in the second paragraph of the 'Operating Expenses' section of the Prospectus." This argument ignores the fact that the disclosure appears in a section of the prospectus entitled "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITIONS AND RESULTS OF OPERATIONS." "OPERATING EXPENSES" is a sub-heading within that section.

Item 303 of Regulation S–K requires a registrant to discuss "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F.Supp.2d 8, 13 (S.D.N.Y.2001). Accordingly, management's belief that prices would decline going forward was properly included in Management's Discussion and Analysis and we will consider it.

that was expected in the future. Flag then revealed that, while there was significant demand for capacity and a belief within the industry that demand would grow with the Internet, the company faced stiff competition and pricing pressure on all of its routes. Rather than leading investors to conclude that Flag would succeed because there simply was not enough capacity to go around, Flag disclosed that there was intense competition that it hoped to overcome by providing better service, lower prices and portable capacity to its customers.

Accordingly, we conclude that Flag had no duty to disclose the conclusions contained in the Little Report because the disclosures in the prospectus revealed all the relevant information contained in that report, i.e. there was a great deal of competition on the trans-Atlantic route that would continue to force prices down.[12] *See Rombach*, 355 F.3d at 175 (holding that the prospectus was not misleading for failing to disclose that a public offering was necessitated by a liquidity crisis and integration problems because the prospectus contained disclosures that should have led investors to that conclusion); *Olkey*, 98 F.3d at 5 (affirming dismissal where the prospectuses warned "investors of exactly the risk the plaintiffs claim[ed] was not disclosed"). Plaintiff, at the time of Flag's IPO, may have been very impressed to know that Arthur Little had forecast that supply on the trans-Atlantic route would outstrip demand until 2006. However, Arthur Little's forecast was just that, a forecast. Having disclosed to investors facts sufficient to allow them to determine the

nature of the competition that the company would face on the trans-Atlantic route, Flag was under no duty to disclose the opinion of an outside consultant based on essentially identical information. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").

### B. *The Alcatel Sales Agreement*

■ Plaintiff's failure to identify a material misstatement or omission in the prospectus concerning demand is not fatal to his § 11 claims because plaintiff has alleged facts sufficient to demonstrate that the Prospectus contained a material misstatement or omission in connection with the Alcatel Sales Agreement.

The existence of the Alcatel Sales Agreement was not alleged in the 2CCAC. According to plaintiff, he learned of the improper sales agreement by reading the complaint (the "Trustee's Complaint" or the "*Rahl* Complaint") filed by the Trustee of the Flag Litigation Trust (the "Trustee") in *Rahl v. Bande, et al.*, No. 04 Civ. 1019 (S.D.N.Y.) (WCC). (3CAC, Preface.) *Rahl* was filed in the Supreme Court of New York State, New York County, by the Trustee against certain officers and directors of Flag (the "individual *Rahl* defendants"), Dallah Abarak Holding Co. ("Dallah"), Verizon, Qwest Communications International Inc. ("Qwest"), Arthur Andersen Worldwide S.C., Arthur Andersen Bermuda and Arthur Andersen & Co. n/k/a Arthur Andersen LLP ("Andersen").[13] The *Rahl* defendants removed the

---

**12.** Similarly, plaintiff paraphrases a statement made by Flag's "former Manager of Market Development" wherein the manager indicated that "the U.S. market was already 'dominated' by well-entrenched carriers by the time the FA–1 system was under construction." (3CAC ¶ 87.) Even accepting this allegation as true, plaintiff has failed to identify a

material misstatement or omission in the Prospectus because Flag disclosed that several well established companies already had an interest in existing trans-Atlantic cable systems as of the Effective Date.

**13.** All of the defendants in *Rahl* are referred to collectively as the "*Rahl* defendants."

action to this Court and we subsequently denied the Trustee's motion to remand the action to state court by Order & Opinion dated July 28, 2004. *See Rahl v. Bande*, 316 B.R. 127 (S.D.N.Y.2004) (the "*Rahl* Opinion").

The Flag Litigation Trust is a New York liquidating trust created by Flag's Plan of Reorganization which was approved by the bankruptcy court on September 26, 2002. Under the Plan, certain Flag bondholders (the "FTGL shareholders") became the sole shareholders of FTGL, the entity that emerged from Flag's bankruptcy case. *See Rahl* Opinion at 129–130. The Plan also assigned all choses in action against the individual *Rahl* defendants possessed by Flag at the time of the filing of its Chapter 11 bankruptcy petition to the Flag Litigation Trust for the benefit of the FTGL shareholders. *See Rahl* Opinion at 130–131.

In the *Rahl* Complaint, the Trustee alleges that the individual *Rahl* defendants breached their fiduciary duties to the company by: (1) deepening Flag's insolvency for their personal gain; (2) issuing false financial statements; and (3) entering into transactions on terms that were unfavorable to Flag and advantageous to Verizon. *See id.* at 130–131.[14] The Trustee asserts claims against Verizon seeking to avoid a fraudulent conveyance and to hold Verizon, Qwest and Dallah liable for aiding and abetting the individual *Rahl* defendants' breaches of fiduciary duty.[15] Finally, the Trustee alleges that Andersen breached its fiduciary duties owed to Flag and committed professional malpractice. *See id.* at 131. Plaintiff contends that the factual allegations that appear in the Trustee's

Complaint are "particularly credible because the Trustee was granted access to certain internal FLAG documents and files, and the Trustee's Complaint contains factual allegations that are drawn from, and which reference, those internal documents and files." (3CAC, Preface.)

According to plaintiff, the Trustee "uncovered a scheme by which FLAG fraudulently inflated the amount of its so-called pre-sales" that were disclosed in the Prospectus. (*Id.* ¶¶ 91–92; Registration Statement at 50.) On January 12, 1999, Flag initially entered into a contract with Alcatel for the construction of the FA–1 system (the "Original Construction Contract"). (3CAC ¶ 92.) The value of the Original Construction Contract was $646 million. (*Id.*) Flag announced in the Prospectus that financing for the construction would be provided by a credit facility arranged by Barclays Bank PLC ("Barclays") and through pre-sales of capacity on the FA–1 system.

On September 20, 1999, Flag and Alcatel entered into a new construction contract (the "Revised Construction Contract") to replace the Original Construction Contract. (*Id.* ¶ 92.) The value of the Revised Construction Contract was $747 million. (*Id.*) According to plaintiff, "[o]ther than the change to the contract sum, there were no other changes to the terms of the Original Construction Contract." (*Id.*) The Flag defendants contend that Flag entered into the Revised Construction Contract to take advantage of new technologies that would allow the company to double the capacity available on the FA–1 system and have offered copies of the Original Construction Contract and Re-

---

**14.** The Trustee also alleges that McCormack caused a Flag subsidiary to issue a dividend in violation of § 54 of the Bermuda Companies Act of 1981. *See Rahl* Opinion at 130–131.

**15.** The Trustee also alleges that two of the individual *Rahl* defendants were agents of Verizon or Dallah and that those companies are therefore liable under the doctrine of *respondeat superior*. *See Rahl* Opinion at 130–131.

vised Construction Contract to support their position. (Flag Defs. Mem. Supp. Mot. Dismiss at 24; Fortinsky Decl. Exs. F, G.)

On October 8, 1999, Flag entered into an agreement with Alcatel wherein Alcatel agreed to purchase 6.2 gigabits of capacity on the FA–1 system for $50 million. (3CAC ¶¶ 93–94.) This transaction was apparently disclosed in the Registration Statement. (*Id.* ¶ 91; Flag Defs. Mem. Supp. Mot. Dismiss at 24 n. 19.) On the same date that Flag entered into this capacity sales agreement with Alcatel, Flag executed a new credit agreement with Barclays Bank wherein Flag was required to commit $100 million in pre-sales of capacity on the FA–1 system in order to secure the desired credit facility. Plaintiff contends that Alcatel's agreement to purchase was not a legitimate customer purchase commitment and was entered into by Alcatel only because Flag agreed to pay Alcatel $100 million. Plaintiff offers, *inter alia,* the following allegations to support this contention: (1) Alcatel is a construction company, not a telecommunications service provider, and would have no use for such a large capacity, (3CAC ¶ 94); [16] (2) the Revised Construction Contract effected only a change in price; (*id.* ¶¶ 92–94); (3) the capacity sales agreement with Alcatel allowed Flag to reduce the amount of capacity it was required to provide to Alcatel if Flag could find other customers that wished to purchase the capacity, an arrangement that Alcatel would not have approved if it actually intended to use the capacity, (*id.* ¶ 97); and (4) the Alcatel sales agreement was executed in close temporal proximity to the credit agreement with Barclays that required Flag to secure pre-sales on its FA–1 system. (*Id.* ¶ 95.)

The Flag defendants argue that plaintiff's allegations are directly contradicted by the Revised Construction Contract because it provides for a capacity upgrade, not only a change in price as plaintiff contends. (Flag. Defs. Mem. Supp. Mot. Dismiss at 24.) Even if this were true, however, it would not negate the allegations in the 3CAC; if the Revised Construction Contract provided for an upgrade, Flag could have agreed to pay more for that upgrade than it was worth in exchange for a purchase commitment from Alcatel. Indeed, if this were the case, it would serve to bolster plaintiff's allegations because, as the Flag defendants point out, paying $100 million for a $50 million purchase commitment would seem illogical. (*Id.*)

We conclude that the allegations in the 3CAC pertaining to the Alcatel Sales Agreement are sufficient to state a claim under § 11. Plaintiff has adequately alleged that Flag had strong incentives to pay Alcatel for the purchase commitment: (1) if it could demonstrate to the market that it had substantial pre-sales on its FA–1 system, Flag could raise more capital in its IPO; and (2) Flag needed to demonstrate that it had the necessary pre-sales on its FA–1 system in order to secure a line of credit from Barclays. More importantly, however, Alcatel is a construction company and there is nothing in any of the parties' submissions that explains why it would require $50 million worth of broadband telecommunications capacity. Defendants do not even hazard a guess on this point. These allegations, along with the factual allegations discussed previously in this section, are sufficient for pleading purposes to demonstrate that Flag inflated the amount of pre-sales on its FA–1 system that was reported in the Prospectus.[17]

---

**16.** According to plaintiff, "even multi-national corporations with intense streaming video requirements ... would use less than 100 megabits worth of bandwidth." (3CAC ¶ 94.)

**17.** We find Citigroup's contention that the 3CAC "fails to allege how the agreement was

Moreover, the allegations are sufficient for pleading purposes to demonstrate that the company omitted to disclose that the pre-sales referred to in the Prospectus included an improper sales commitment with Alcatel.[18] Accordingly, we deny the motions of Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan and Citigroup to dismiss plaintiff's § 11 claims.

## IV. *Plaintiff's § 12(a)(2) Claims*

Plaintiff asserts claims under § 12(a)(2) of the Securities Act against each of the individual defendants and Citigroup. Section 12(a)(2) allows a plaintiff to proceed against "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements ... not misleading ...." 15 U.S.C. § 77*l*(a). A claim under § 12(a)(2) must be brought within three years of the date of the sale. 15 U.S.C. § 77m.

■■ In order to state a claim against a seller under this section, the plaintiff must be in privity with the defendant; "a buyer cannot recover against his seller's seller." *Pinter v. Dahl,* 486 U.S. 622, 642, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). A "seller" under this provision is the party who "passed title, or other interest in the security to the buyer for value." *Id.* However, a party that is not in privity with the

plaintiff may still be held liable under § 12(a)(2) if he solicited the plaintiff's purchase and was motivated in some way by his own financial interest. *See id.* at 647, 108 S.Ct. 2063; *see also In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 409 (S.D.N.Y.2003). An officer or director who signs a Registration Statement containing materially false or misleading statements or omissions is deemed, for pleading purposes, to have solicited a purchase within the meaning of this section. *See, e.g., Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301 (S.D.N.Y.1996).

■ In *Flag I* we dismissed plaintiff's § 12(a)(2) claims for two reasons: (1) plaintiff did not identify a material misstatement or omission in the Prospectus; and (2) none of the named plaintiffs purchased shares of Flag in the company's IPO. 308 F.Supp.2d at 257; *see also Laser Mortgage Mgmt., Inc. v. Asset Securitization Corp.,* No. 00 Civ. 8100, 2001 WL 1029407, at *7–8 (S.D.N.Y. Sep.6, 2001) (noting that § 12(a)(2) applies only to public offerings and therefore aftermarket purchasers lack standing to bring a claim under § 12(a)(2)); *Waltree Ltd. v. ING Furman Selz LLC,* 97 F.Supp.2d 464, 469 (S.D.N.Y.2000). As we held *supra* in the Discussion Section Part III., plaintiff has identified a material misstatement or omission in the Prospectus. Thus, he has cured the first defect. The individual de-

'improper, let alone fraudulent" ' puzzling. (Citigroup's Mem. Supp. Mot. Dismiss at 23.) Plaintiff has alleged that Flag increased the amount of a contract with a client so that the client would use the funds to purchase capacity it did not need to help Flag defraud investors and Barclays. If these allegations are proven true, we shall have little trouble labeling the Alcatel Sales Agreement improper and fraudulent.

18. Citigroup contends that we must dismiss because the 3CAC contains factual allegations

demonstrating that plaintiff filed the May 2002 Complaint more than a year after he was placed on inquiry notice of his claims. (Citigroup's Mem. Supp. Mot. Dismiss at 11 n. 3.) As we ruled *supra* in the Discussion Section Part I., the facts alleged in the 3CAC reveal that plaintiff was placed on inquiry notice of his claims on February 13, 2002. The May 2002 Complaint was filed approximately three months after this date and was therefore filed in a timely manner. *See* 15 U.S.C. § 77m.

fendants argue that although plaintiff may have also cured the latter defect by naming a plaintiff who purchased in Flag's IPO, plaintiff § 12(a)(2) claims are barred by the statute of repose.

When plaintiff filed his 3CAC he named as a plaintiff Norman Hunter, who purchased shares of Flag in the company's IPO on February 16, 2000, because Hunter had standing to bring § 12(a)(2) claims. (3CAC ¶ 51.) The individual defendants contend that we must still dismiss plaintiff's § 12(a)(2) claims because Hunter was not named as a plaintiff until March 20, 2004, more than a year after the statute of repose had run. We conclude that Hunter's § 12(a)(2) claims against the individual defendants were tolled by the filing of plaintiff's May 2002 Complaint and, thus, plaintiff timely raised those claims against the individual defendants in the 3CAC.

In *American Pipe & Construction Co. v. Utah,* the Supreme Court held that the filing of a class action suit tolls the applicable limitations period for each class member. 414 U.S. 538, 552–53, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *see also Korwek v. Hunt,* 827 F.2d 874, 876–77 (2d Cir.1987).[19]

The Supreme Court noted that a contrary rule would undermine the policies of "efficiency and economy of litigation" underlying FED. R. CIV. P. 23 because

> [p]otential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable. In cases such as this one, where the determination to disallow the class action was made upon considerations that may vary with such subtle factors as experience with prior similar litigation or the current status of a court's docket, *a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions.*

*American Pipe,* 414 U.S. at 553–54, 94 S.Ct. 756 (footnote omitted) (emphasis added); *see also In re Initial Public Offering Sec. Litig.,* 214 F.R.D. 117, 123 n. 9 (holding that the § 12(a)(2) claims of class members who wished to join the lead plaintiff's action were tolled under *American Pipe* by the filing of lead plaintiff's action).[20]

---

19. "The *American Pipe* rule has been extended to statutes of repose." *Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 277 B.R. 20, 31 (S.D.N.Y.2002).

20. The Flag defendants cite *In re Colonial Ltd. P'ship Litig.,* wherein the court set forth the following general proposition of law: "[I]f the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class." 854 F.Supp. 64, 82 (D.Conn. 1994) (citing *Korwek,* 827 F.2d at 879). We respectfully disagree with this interpretation of the law. First, as discussed more fully in the text following this footnote, the failure to apply the *American Pipe* rule to cases where a class action complaint was dismissed for lack of standing undermines the policies underlying Rule 23 and is inconsistent with the Court's reasoning in *American Pipe.* Second,

the court in *Colonial* cited *Korwek* to support its assertion that *American Pipe* is inapplicable to cases where the original plaintiff lacked standing to file a class action. However, *Korwek* is silent on this subject and stands only for the proposition that once class certification is denied, putative class members may not rely on the *American Pipe* rule to commence a new, substantially identical class action because this would allow the putative class members to "argue and reargue the question of class certification by filing new but repetitive complaints." *Korwek,* 827 F.2d at 879; *see also Initial Public Offering,* 214 F.R.D. at 123 n. 9. Indeed, the Second Circuit expressly limited its holding in *Korwek* by stating, "This Court notes that it leaves for another day the question of whether the filing of a potentially proper subclass would be entitled to tolling under *American Pipe.*" 827 F.2d at 879.

In the present case, failure to apply the *American Pipe* rule would undermine the policies of "efficiency and economy of litigation" which underlie Rule 23. On May 1, 2002, two years, two months and twelve days after the sale to Hunter, plaintiff filed a proposed class action raising, *inter alia*, § 12(a)(2) claims on behalf of a class of investors who purchased shares in Flag's IPO. Rule 23 and the PSLRA tend to encourage investors who might otherwise bring lawsuits to refrain from filing a complaint or intervening in an action when those investors feel their interests are adequately protected in a proposed class action that has already been filed. Indeed, an investor such as Hunter would probably have concluded that he had little chance of becoming lead plaintiff after Loftin, who appears to have invested a substantial amount of capital in Flag, filed his May 2002 Complaint. Hunter should not be punished simply because he failed to anticipate that plaintiff's § 12(a)(2) claims would be dismissed because none of the named plaintiffs in the action had standing to sue on those claims. Therefore, Hunter's § 12(a)(2) claims were tolled from May 1, 2002, until at least February 25, 2004, the date that we dismissed plaintiff's § 12(a)(2) claims.

■ On April 14, 2004, Hunter was named as a plaintiff in the 3CAC. Subtracting the period when Hunter's § 12(a)(2) claims were tolled, Hunter's § 12(a)(2) claims were filed approximately two years and four months after the sale to Hunter, within the time allowed by 15 U.S.C. § 77m. Accordingly, we deny the motions of Bande, McCormack, Rubin, Petri, McQuaid, Seskin and Suan to dismiss

plaintiff's § 12(a)(2) claims. However, we dismiss plaintiff's § 12(a)(2) claims against Evans and Bautista with prejudice because they did not sign the Registration Statement, nor were they directors at the time of the IPO, and plaintiff has failed to allege that they solicited purchases from buyers in Flag's IPO by some other means. *Cf. In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571(HB), 2003 WL 22489764, at 21 (S.D.N.Y. Nov.3, 2003), 2003 U.S. Dist LEXIS 19431, at *76 (noting that for pleading purposes a signatory to a prospectus containing material misstatements or omissions is deemed to have solicited a sale under § 12(a)(2)).

■ Citigroup contends that we must dismiss plaintiff's § 12(a)(2) claims against it because plaintiff has not alleged that Hunter purchased shares from Citigroup. We find this contention unpersuasive. Plaintiff alleges that Hunter purchased shares in Flag's IPO. (3CAC ¶ 51.) He also alleges that Citigroup served as lead underwriter for the IPO, (*id.* ¶ 65), and the Prospectus reveals that the IPO was a "firm commitment" offering. (Registration Statement at 79.)[21] These allegations are sufficient, for pleading purposes, to state a claim against Citigroup under § 12(a)(2). *See Holographics*, 93 F.Supp.2d at 437–39 (refusing to dismiss § 12(a)(2) claims against the underwriter for the plaintiffs' failure to allege that they purchased shares directly from the underwriter because the IPO involved a "firm commitment" underwriting and the underwriter offered shares to the public in connection with that IPO). Accordingly, Citi-

21. "In a 'firm commitment' underwriting: the underwriters agree that they will purchase the shares being offered for the purpose of resale to the public." *See In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 438 (S.D.N.Y.2000) (hereinafter *"Holographics"*) (citing R. Jennings & H.

Marsh, Jr., Securities Regulation § 135 (6th Ed.1987)). Accordingly, the issuer passes title to the underwriter and "[a] direct sale to public investors makes an underwriter a 'seller' within the meaning of Section 12(a)(2)." *Id.* at 439; *see also WorldCom*, 294 F.Supp.2d at 409.

group's motion to dismiss plaintiffs § 12(a)(2) claims against it is denied.

## V. *Plaintiff's § 15 Claims*

■ Plaintiff asserts claims under § 15 of the Securities Act against the individual defendants and Verizon. Section 15 allows a plaintiff to proceed against "[e]very person who, by or through stock ownership, agency or otherwise . . . controls any persons liable under section 11" of the Securities Act. 15 U.S.C. § 77o. To state a claim under this provision a plaintiff must plead: (1) a primary violation; and (2) control over the primary violator. *See Indep. Energy Holdings,* 154 F.Supp.2d at 770 (a plaintiff is not required to plead "culpable participation" to state a claim under § 15). "Control" in this context is defined as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." 17 C.F.R. § 240.12b–2; *SEC v. First Jersey Sec., Inc.* 101 F.3d 1450, 1473 (2d Cir. 1996). "It is well accepted that merely alleging that a particular defendant is a director or an officer of a company is not sufficient to allege control." *In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 309 (E.D.N.Y.2002). However, control of a primary violator at the time of an offering is sufficiently pled where a plaintiff alleges that the defendant signed a registration statement containing materially false or misleading statements. *See id; see also In re Leslie Fay Companies, Inc. Sec. Litig.,* 918 F.Supp. 749 (S.D.N.Y.1996) (Conner, J.). Because plaintiff has pled a primary violation by Flag under § 11, *see supra* Discussion Section Part III., we are required only to consider whether the individual defendants and Verizon controlled Flag.

### A. *The Individual Defendants*

■ Bande, McCormack, Rubin, Petri, McQuaid, Seskin and Suan were officers or directors of Flag who signed the Registration Statement. Accordingly, we conclude that they controlled Flag at the time of Flag's IPO and deny their motions to dismiss plaintiff's § 15 claims. Neither Evans nor Bautista signed the Registration Statement and there are no allegations in the 3CAC sufficient to establish that Evans or Bautista were control persons at the time of Flag's IPO. Accordingly, we grant the motions of Evans and Bautista to dismiss plaintiff's § 15 claims against them.

### B. *Verizon*

■ Verizon's predecessor was a member of a consortium of investors that created the entity that eventually became Flag. After Flag's IPO, Verizon owned 30% of Flag's common stock and was the company's largest shareholder. (3CAC ¶ 210.) Verizon's ownership stake allowed it to appoint three members to Flag's nine member Board of Directors. (*Id.* ¶ 211.) On May 2, 2001, an analyst noted the following in a report: "The bond between the companies is extremely strong, where key strategic decisions are approved by both Verizon and Flag." (*Id.* ¶ 240.) We held in *Flag I* that these allegations were insufficient for pleading purposes to establish that Verizon controlled Flag. 308 F.Supp.2d at 273.

Plaintiff has included a host of new allegations in the 3CAC in an attempt to plead Verizon's status as a control person of Flag. Plaintiff points to the allegations in the *Rahl* Complaint wherein the Trustee alleges that Verizon aided and abetted the breaches of fiduciary duty of certain Flag directors who were appointed by Verizon (the "Verizon designees"). According to the Trustee, the Verizon designees induced Flag to build networks for the benefit of Verizon and to Flag's detriment. (3CAC ¶¶ 212–15.)

Plaintiff also contends that on February 28, 2001, Flag purchased $42.5 million of capacity on Qwest's Euroring network ("the KPNQwest Sales Agreement") solely to benefit Verizon. (*Id.* ¶ 225.) After the KPNQwest Sales Agreement was executed, Flag assigned to Verizon (the "Verizon Purchase Agreement") its rights under the KPNQwest Sales Agreement. (*Id.* ¶¶ 224, 234.) The Verizon Purchase Agreement was structured to allow Verizon to purchase as little or as much of the capacity that Flag had acquired on the Euroring network at a price that was below cost. (*Id.* ¶¶ 229–35.) Although Verizon purchased $27.7 million of the capacity Flag originally acquired under the KPNQwest Sales Agreement, Flag was ultimately saddled with $14.8 million of useless capacity on the Euroring network because Verizon declined to purchase it. (*Id.* ¶ 234.) Moreover, soon thereafter, Flag purchased $36 million worth of capacity on Verizon's European Network. (*Id.* ¶ 217.)

In addition to referring to the Trustee's Complaint in support of these allegations, plaintiff has included allegations based on an interview with a former Flag Network Planner. The Network Planner contends that he spoke with Mark Greorge, who participated in the negotiations for the Verizon Purchase Agreement, and some unnamed lawyers who structured the deal. According to the Network Planner, Flag was "instructed" by Verizon to purchase capacity on the Euroring network for resale to Verizon. (*Id.* ¶ 226.) Then " 'FLAG was strong-armed into booking capacity with Verizon [on Verizon's European Network] that FLAG didn't need and Verizon never provided.' " (*Id.* (quoting the former Network Planner).) According to the former Network Planner, certain Flag insiders were upset by Flag's decision to purchase capacity on the Euroring network, assign it to Verizon to allow Verizon to create a European network and then purchase capacity on Verizon's Euro-

pean network. The Flag insiders believed that Flag could have built the entire network from scratch for less than what they paid Verizon or Qwest. (*Id.* ¶¶ 237–38.)

These allegations do not demonstrate that Verizon possessed "the power to direct or cause the direction of the management and policies of" Flag. 17 C.F.R. § 240.12b–2. In order to allege "control person" status, plaintiff must allege that the defendant had actual control over the primary violator. *See In re Blech Sec. Litig.,* 961 F.Supp. 569, 586 (S.D.N.Y.1997) ("Actual control is essential to control person liability."). Control in this context "is not the mere ability to persuade, but almost 'always means the practical ability to *direct* the actions of people who issue or sell securities.' " *Ross .v. Bolton,* No. 83 Civ. 8244 (WK), 1989 WL 80428, at *3 (S.D.N.Y. Apr.4, 1989) (quoting *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 494 (7th Cir.1986)); *see also Dietrich v. Bauer,* 126 F.Supp.2d 759, 765 (S.D.N.Y.2001) (noting that actual control in this context " 'requires only the ability to direct the actions of the controlled person, and not the active exercise thereof.' ") (quoting *Sanders v. Gardner,* 7 F.Supp.2d 151, 163 (E.D.N.Y.1998)).

Plaintiff has alleged that Flag entered into speculative ventures to construct networks because they would be of use to Verizon but this does not tend to show that Verizon controlled Flag. Verizon owned 30% of Flag's voting shares and had the power to appoint three members to Flag's Board of Directors. If the Verizon designees convinced enough of the other six members of the Board of Directors to allow Flag to enter into unduly speculative ventures to benefit Verizon, it would have been the result of the exercise of their powers of persuasion, not through actual control of Flag. That a party "*affected* [a primary violator's actions] . . . does not

mean, however, that it *directed* those actions." *Ross*, 1989 WL 80428, at * 4. Moreover, the fact that Flag, a self-styled "carriers' carrier" sought to cultivate a strategic alliance with Verizon, and took substantial risks to do so, is not surprising in light of the fact that Verizon is an incumbent carrier with an established customer base. Indeed, there were several carriers' carriers competing for Verizon's business on Flag's routes. *See supra* Background Section Part I.B. The "control person" provisions were included in the federal securities laws to "prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws." *Ross*, 1989 WL 80428, at *3 (citing *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975)). They were not created to allow a plaintiff to sue an entity merely because that entity convinced a primary violator to enter into unwise business transactions.

Similarly, plaintiff has alleged that Flag sold the capacity it acquired from Qwest to Verizon on terms that were unusually favorable to Verizon so that Verizon could build a European network. Shortly thereafter, plaintiff alleges, Flag purchased capacity on Verizon's European Network even though Flag had no need for capacity on that network. Like the allegations concerning Flag's willingness to enter into speculative ventures to benefit Flag, these allegations are insufficient to plead control because plaintiff has not alleged facts creating the inference that Verizon directed Flag's actions. While Flag's former Network Planner states that Flag was "instructed" to purchase capacity from Qwest for Verizon's benefit, he does not indicate that Flag was somehow forced to follow that instruction. Similarly, although the Network Planner states that Flag was "strong armed" into purchasing capacity on Verizon's European Network, there is no indication that Flag's management or Flag's Board of Directors could not have simply declined to comply with Verizon's demand.

Plaintiff cites *In re Leslie Fay Companies Sec. Litig.*, wherein we held that the plaintiff adequately alleged control person status despite the fact that the defendants owned only 12% of the primary violator's voting shares. 918 F.Supp. at 762–63. Plaintiff appears to argue that in *Leslie Fay* we recognized that a plaintiff need not plead "actual control" of a primary violator. (Pl. Mem. Opp. Mot. Dismiss at 3.) However, in *Leslie Fay*, plaintiff's allegations demonstrated that the defendants had actual control over the primary violator because plaintiff alleged that they were directors who signed fraudulent SEC filings and controlled the content of the company's statements to the public. 918 F.Supp. at 763–64. These allegations were sufficient to plead "actual control" because the defendants were in a position to direct the acts of the primary violator and could have prevented the issuance of the company's false statements.

Plaintiff does not allege that Verizon controlled Flag through stock ownership and none of the allegations in the 3CAC demonstrate that Verizon controlled the dissemination of the statements in the Prospectus that plaintiff alleges were materially false or misleading. Moreover, while plaintiff has pled facts creating the inference that Flag management was persuaded by Verizon to enter into improvident business transactions, plaintiff has not pled facts creating the inference that Verizon could have directed Flag to enter into the allegedly improper Alcatel Sales Agreement. Accordingly, we grant Verizon's motion to dismiss plaintiff's § 15 claims against it.

## VI. *Plaintiff's § 10(b) and Rule 10b–5 Claims*

Plaintiff asserts claims against Bande, McCormack, Evans and Bautista under

§ 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.[22] To state a *prima facie* case for securities fraud under these provisions a plaintiff must show that " 'in connection with the purchase or sale of securities' " the defendant: (1) made a false representation of material fact or omitted to disclose material information that the defendant had a duty to disclose; (2) acted with scienter; and (3) " 'that plaintiff's reliance on defendant's action caused [plaintiff] injury.' " *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999)) (alterations in original). Because the only issue raised on the present motion is whether plaintiff has adequately alleged that Bande, McCormack, Evans and Bautista made materially false or misleading statements with scienter, we will discuss only the first two factors.

Securities fraud actions are subject to the pleading requirements of FED. R. CIV. P. 9(b) which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, "a complaint 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995)). A plaintiff who alleges securities fraud under § 10(b) and Rule 10b–5 must also satisfy the heightened pleading standards of the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). To plead a material misrepresentation or omission under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

### A. *Falsity*

#### 1. *Flag's Reciprocal Transactions*

██ Plaintiff contends that Flag artificially inflated its reported revenues and EBITDA during fiscal years 2000 and 2001 by entering into reciprocal transactions with competitors. (*Id.* ¶ 9.) Reciprocal

---

**22.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b). Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

transactions are swaps of telecommunications capacity between competitors. These transactions may be entered into for legitimate reasons, i.e. to acquire access on networks in a market that a company wishes to enter in exchange for capacity that has yet to be sold and is not otherwise in use ("dark fiber"). However, swap transactions can also be utilized by a company seeking to defraud investors or its creditors to create the impression that the company is selling capacity when it is merely unloading useless dark fiber on one of its networks in exchange for useless dark fiber on a competitor's network. According to James Crowe, CEO of Level 3 Communications, " '[T]he telecom industry has been rife with "hollow swaps" which serve no purpose other than to inflate a company's bottom line.' " (*Id.* ¶ 14.)

Plaintiff contends that Flag entered into reciprocal transactions for the sole purpose of inflating revenues and that Flag managed to inflate its revenues for FY:01 by 14% as a result. Plaintiff points to the allegation of a former Global Crossing executive wherein he identified three end-of-the-quarter swap transactions entered into with Flag that were allegedly improper. (*Id.* ¶ 143.) Plaintiff also cites congressional testimony from Patrick Joggerst, Global Crossing's former President of Carrier Sales, wherein Joggerst stated that Global Crossing and Flag engaged in "upscoping" in order to meet earnings estimates. According to Joggerst,

> Upscoping is when there is a customer that we're working with and they are— where we increase the size of the deal that we're doing with them and they increase the size of the deal that they're doing with us. Typically that happened a couple of times that I can recall at the end of the quarter, particularly with FLAG.

(*Id.* ¶ 144.) Because the cost of acquiring the capacity could be booked as a capital expenditure rather than a current expense, the swap transactions had a pronounced effect on EBITDA, a *pro forma* figure that does not reflect charges for depreciation. (*Id.* ¶ 12.)

Plaintiff's 2CCAC contained allegations pertaining to Flag's allegedly improper swap transactions. However, we dismissed the claims in the 2CCAC that were dependent upon those allegations because plaintiff failed to adequately allege that Flag entered into the swap transactions solely to artificially inflate revenues. *Flag I*, 308 F.Supp.2d at 262–63. We noted that because plaintiff was essentially asking the Court to find adequate the allegations in the 2CCAC because Flag did business with companies that engaged in improper swaps, plaintiff had offered "what [was] essentially a 'guilt by association' argument." *Id.* at 263. In order to demonstrate falsity and create the requisite strong inference of scienter, plaintiff needed to include allegations that demonstrated that the Flag defendants knew or should have known that Flag had no likely use for the capacity it was acquiring. *Id.* at 262. In the 3CAC, plaintiff has included allegations in an attempt to cure the defects we identified in the 2CCAC. We conclude that these allegations are sufficient to support claims that Flag's financial results for 2Q:00, 3Q:00, FY:00, 1Q:01, 2Q:01, 3Q:01 and FY:01 were false when issued because Flag entered into improper reciprocal transactions to artificially inflate revenues.

Plaintiff, through reference to the Trustee's Complaint, has identified the following allegedly fraudulent reciprocal transactions:

On June 23, 2000, Flag and Qwest entered into an ROU agreement wherein Qwest agreed to acquire capacity on the FEA system for a purchase price of $16.8 million. Shortly thereafter, on June 28, 2000, Flag purchased $16.8 million of ca-

pacity on Qwest's network linking the United States and Japan ("KPNQwest Swap # 1"). (*Id.* ¶ 137.)

On June 30, 2000, Qwest agreed to purchase another $8 million worth of capacity on the FEA system. On that same date, Flag entered into an ROU agreement wherein it agreed to purchase $8 million worth of capacity on an un-designated route in Europe ("KPNQwest Swap # 2"). Both the KPNQwest Transaction # 1 and the KPNQwest Transaction # 2 were entered into during the last week of 2Q:00. (*Id.*)

On February 28, 2001, Qwest agreed to purchase $42.5 million worth of capacity on the FA–1 system, which was still under construction. On that same date, Flag agreed to purchase $42.5 million worth of capacity on KPNQwest's Euroring Network ("KPNQwest Swap # 3"). A portion of the capacity obtained by Flag was later assigned to a Verizon subsidiary. (*Id.*) [23]

On April 1, 2001, Qwest agreed to purchase capacity for a term of twenty years on the FEA system. The purchase price was $18.4 million of which $10.2 million was payable on April 2, 2001. On March 30, 2001, Flag agreed to purchase $10.2 million in capacity on KPNQwest's Euroring Network payable March 31, 2001 ("KPNQwest Swap # 4"). (*Id.*)

On June 27, 2001, Qwest agreed to purchase from Flag $20 million worth of capacity on Flag's North Asian Loop system (the "FNAL system") for a term of twenty-one years payable upon execution. On that same date, Flag agreed to purchase from Qwest $20 million worth of capacity on a Qwest cable connecting the Pacific Northwest to Tokyo, Japan ("KPNQwest Swap # 5"). Fifteen of the twenty million dollars was payable upon execution of that agreement. (*Id.*) This transaction was executed near the end of 2Q:01. (*Id.*)

On June 29, 2001, Flag agreed to purchase $32.5 million worth of capacity on Global Crossing's Pacific Crossing and East Asia Crossings systems for a term of fifteen years. On July 2, 2001, Global Crossing agreed to purchase $43.3 million worth of capacity on Flag's FA–1 system, FEA system and FNAL system (the "Global Crossing Swap"). Both IRUs contained portability clauses.

On September 28, 2001, Flag entered into an IRU agreement to purchase $26 million worth of capacity on KPNQwest's Euroring Network for a period of twenty years. Twenty-five percent, or $6.5 million, was due on execution of the IRU. On October 1, 2001, Qwest agreed to purchase $43.2 million worth of capacity on Flag's FEA system for a period of twenty years with $10.8 million due at execution ("KPNQwest Swap # 6"). (*Id.*)

Plaintiff contends that Flag entered into these transactions without any intention of using the capacity it was acquiring because it could not be incorporated into any of its existing or planned networks. Plaintiff points to the allegation in the *Rahl* Complaint wherein the Trustee states:

'FLAG spent $223.7 million to obtain network capacity from ... telecom companies that were direct competitors. Of this amount, $133 million, or 60%, was never expected to be utilized because FLAG's network requirements did not match the routes it purchased. It was purchased for the sole purpose of inflat-

---

**23.** Plaintiff alleges that Verizon "instructed" Flag to acquire this capacity on the Euroring network so that Verizon could obtain the same capacity at or below cost as Verizon needed that capacity. *See supra* Discussion Section Part V. This allegation tends to under-

mine plaintiff's contention that Flag had no use for the capacity it received when it entered into the KPNQwest Swap # 3 because it tends to show that Flag had a purchaser for the capacity it acquired.

ing the amount FLAG disclosed as Cash Revenue without any business purpose at all.'

(*Id.* ¶ 136 (quoting the Trustee's Complaint).)

Plaintiff has also offered statements from confidential sources in an attempt to demonstrate that Flag entered into capacity swaps with competitors in a fraudulent effort to inflate revenues. According to a former Flag network planner, at informal gatherings after work Flag's lawyers and finance people "would almost boast" that they had been artificially generating revenues. (*Id.* ¶ 140.) Moreover, the network planner claims that she overheard a discussion regrading the KPNQwest Swap # 4 wherein Frank Denniston, Flag's Chief Technology Officer at the time, stated that " '[t]his is all for the fiscal figures.' " (*Id.* ¶ 141 (quoting the network planner).)

Flag's former Vice President for Sales in North America recalled that after Flag entered into the Global Crossing Swap, senior management " 'sat and said what are we going to do with these thirty million dollars worth of credits from Global Crossing?' " (*Id.* ¶ 146 (quoting the vice president).) According to the vice president, transactions like the Global Crossing Swap were entered into at the direction of management solely to artificially inflate revenues. Plaintiff quotes the following statement from the vice president: " 'They said let's go cut the deal. We need the revenue. That would be Ed McCormack.... We were going to do reciprocal deals because that was the only way to make revenue.' " (*Id.* ¶ 147.) Moreover, a former sales support engineer states that he was told not to worry about delivering the capacity that was the subject of Flag's swap agreements with competitors "because 'the other side' did not care whether the capacity was ever delivered." (*Id.* ¶ 150.)

These allegations are sufficient for pleading purposes to establish that all of Flag's financial results issued after June 23, 2000, and before February 13, 2002, were materially false or misleading when issued because Flag entered into swaps with competitors for the sole purpose of artificially inflating revenues. Thus plaintiff has alleged that Flag's reported financial results for 2Q:00, 3Q:00, FY:00, 1Q:01, 2Q:01, 3Q:01 and FY:01 were materially false when issued.

The Flag defendants argue that we must dismiss this claim because plaintiff has "offered no facts to suggest that the transactions were a sham and that it was therefore not proper to record the revenues from them." (Flag Defs. Mem. Supp. Mot. Dismiss at 29.) However, plaintiff has pled facts demonstrating that many telecommunications companies were inflating revenues by entering into improper reciprocal transactions. Executives for two of Flag's competitors contend that their companies entered into improper reciprocal transactions with Flag. Although we dismissed the 2CCAC because plaintiff alleged only that Flag allowed other telecommunications companies to enter into improper swaps with it so that those companies could inflate their revenues, plaintiff has included allegations in the 3CAC that tend to show that Flag entered into these transactions to artificially inflate Flag's revenues. The Trustee, after reviewing Flag's internal documents, alleges that the capacity Flag received was useless to any of its existing or planned networks. A former Flag employee overheard Flag's acting CTO admit that the KPNQwest swap # 4 was executed solely to inflate revenues. Indeed, employees with knowledge of the company's finances discussed over drinks that they were artificially creating revenues. The statements attributed to the former vice president are particularly damaging because he contends

that he was directed to enter into swaps for the sole purpose of creating revenues. Finally, a former Flag engineer stated that he was told to disregard whether the capacity Flag was providing to a competitor actually could be utilized because the competitor did not intend to use the capacity.[24] These allegations are sufficient when coupled with the detailed allegations in the 3CAC concerning specific reciprocal transactions to demonstrate that Flag improperly booked revenues from reciprocal transactions.

The Flag defendants appear to argue that even if plaintiff adequately alleged that Flag entered into reciprocal transactions to inflate revenues, Flag's financial statements were nonetheless accurate because they reflected expense charges for the capacity that Flag acquired from its swap partners. (*Id.* at 29.) If Flag took a charge to its revenues equal to the amount of the deferred revenue that it recognized from reciprocal transactions each quarter, then the company's reported revenue figures would not have been materially misleading. However, Flag apparently did not take a charge to revenues equal to the revenues it received from reciprocal transactions. Indeed, as discussed *infra* in the Discussion Section Part VI.A.2.a., Flag was forced to restate its financials for 2000 and 2001 because it had recognized revenues from reciprocal transactions. (Fleischman Decl., Ex. 8 at F–24–F–25.)

### 2. *GAAP Violations*

### a. *Flag's Accounting For Its Reciprocal Transactions*

█ In *Flag I,* we held that plaintiff successfully pled that Flag accounted for

its reciprocal transactions in violation of GAAP because Flag accounted for its swap transactions using the "fair value" of the capacity rather than its "book value." 308 F.Supp.2d at 263. Subsequent to the filing of plaintiff's 2CCAC, FTGL restated Flag's earnings for fiscal years 2000 and 2001 in part because Flag had recorded revenues from reciprocal transactions using "fair value" rather than "book value." By accounting for the swap transactions in this manner Flag was able to record revenues from reciprocal transactions. If those transactions had been accounted for properly using "book value" the company would not have recognized any revenues from reciprocal transactions during 2000 and 2001, and therefore the companies reported financials were adjusted accordingly. (Fleishman Decl., Ex. 8 at F–24–F–25.)

The Flag defendants argue that plaintiff's allegations concerning this violation of GAAP do not create an inference of falsity or scienter because Flag disclosed in SEC filings that it was accounting for reciprocal transactions using "fair value." They cite Flag's Form 10–K for FY:00 wherein the company stated: "[C]ertain customers have committed to purchase capacity at a future date under signed capacity credit agreements. Amounts received under these agreements and the capacity credits granted to suppliers are recorded at fair value ...." (Fortinsky Decl., Ex. MM at F–11.) This statement makes no reference to Flag's reciprocal transactions and, thus, it does not amount to a disclosure of the relevant accounting policy. Although Flag did disclose the relevant accounting policy in its Form 10–K for

---

**24.** According to the Flag defendants, the statements of Flag's former employees are far too "vague and ambiguous" to demonstrate that Flag was engaged in the same fraudulent practices as some of its swap partners. (*Id.* at 30.) However, the information in the 3CAC gleaned from confidential sources is sufficiently specific and the sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 314.

FY:01, this report was issued after the class period making the information useless to investors who purchased during the class period. (*Id.,* Ex. NN at 30–32). However, even if Flag had disclosed the relevant accounting policy sooner than it did, that disclosure, in all likelihood, would not have led investors to the conclusion that booking swaps at "fair value" rather than "book value" allowed Flag to exchange useless capacity to generate revenues.

The Flag defendants also argue that no inference of falsity or scienter can arise from Flag's improper accounting for reciprocal transactions because the SEC did not issue an interpretation denouncing the practice of booking swaps at "fair value" until August 2002. Moreover, they note "the interpretation of GAAP is anything but an exact science." (Flag Defs. Mem. Supp. Mot. Dismiss at 41.) Accounting may be an inexact science but, as we noted in *Flag I,* 308 F.Supp.2d at 263, plaintiff has alleged that Flag's interpretation of the relevant accounting rule was unreasonable because it relied on the premise that a reciprocal transaction was not "an exchange of similar productive assets." (Fleischman Decl., Ex. 8 at F–23.) The fact that the SEC did not issue a position paper announcing that when telecommunications companies exchange IRU's they are exchanging assets and that such transactions should be booked accordingly is insufficient to undermine plaintiff's allegations. Accordingly, plaintiff has again adequately alleged that Flag's accounting for reciprocal transactions violated GAAP.

### b. *Failure to Timely Write–Down Impairment*

The 3CAC also contains allegations sufficient for pleading purposes to establish that Flag's $359 million impairment charge to its FA–1 system should have been taken sooner than it was and that Flag failed to timely write-down the impairment to its long-lived assets. Plaintiff alleges that in 1999, 2000 and 2001, prices declined on the trans-Atlantic route by 70% annually. (3CAC ¶ 33.) Flag's former Vice President of Sales for North America revealed that by May or June 2001, " 'all of North America [had] imploded' in terms of demand for telecommunications." (*Id.* ¶ 74 (quoting the vice president).) Indeed, according to the vice president, by this time Flag consistently missed sales targets in North America by 80–90%. (*Id.*) Other confidential sources confirm the vice president's assertions. (*Id.* ¶ 75.) Finally, plaintiff has alleged that by April 1, 2001, Flag had come to rely increasingly upon improper reciprocal transactions. (*Id.* ¶ 137.) These allegations are sufficient for pleading purposes to indicate that Flag should have been aware that the value of its FA–1 system was impaired at some point during the Spring 2001 and could have estimated an appropriate charge at that point.

Although plaintiff's allegations concerning Flag's failure to timely write down the impairment to its other long-lived assets are less detailed, we conclude that plaintiff has adequately alleged that Flag should have recognized impairment to its other long-lived assets during the class period. When Flag announced that it would need to take a charge for impairment to its FA–1 system Flag noted, "at this time we do not believe that the FEA system is impaired." (*Id.* ¶ 198.) However, in its bankruptcy proceeding, Flag estimated that the value of its property and equipment was $385 million. (*Id.* ¶ 199.) This figure was substantially less than the $2.3 billion that Flag represented its property and equipment were worth in it 3Q:01 financial results. We conclude that these allegations are sufficient to plead that Flag violated GAAP by failing to timely write down the impairment to its long-lived assets because: (1) plaintiff has adequately

alleged that Flag failed to timely write-down the impairment to its FA–1 system; and (2) the fact that Flag's property and equipment were worth considerably less than once reported was revealed only after Flag entered bankruptcy and management was no longer in control of the company. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571(HB), 2003 WL 22489764, at *12 (S.D.N.Y. Nov. 3, 2003) (holding that violation of Statements of Financial Accounting Standards ("SFAS") No. 121 was properly pled where the write-down took place directly after key management figures left the company, thus giving rise to an inference that it should have been taken earlier).

Accordingly, we conclude that plaintiff has adequately alleged at least three violations of GAAP that affected the accuracy of Flag's financial reporting.

### 3. *Other Alleged Misstatements During the Class Period*

■ As we have detailed *supra* in the Background Section Part II.A., plaintiff has identified a host of statements made by Bande and McCormack in press releases concerning demand and optimistic statements concerning the FA–1 system. Plaintiff has not alleged facts sufficient to indicate that any of these statements made prior to April 1, 2001, were materially false or misleading. However, it is alleged in the 3CAC that by April 1, 2001, Flag began to increase its reliance upon improper reciprocal transactions with competitors to inflate earnings. Moreover, market conditions were clearly deteriorating as of that date, making any optimistic statements concerning demand on Flag's routes at least questionable. (3CAC ¶ 71.) Therefore, plaintiff has adequately alleged that by April 1, 2001, the only reason that Flag officials may have had for making optimistic statements to the public was that they had managed to keep the company afloat by improperly reporting reciprocal transactions. Accordingly, we conclude that plaintiff has properly pled that the following statements were materially false or misleading: (1) "'Demand across the network routes remains strong,'" (*id.* ¶ 170 (quoting Bande from a press release issue April 24, 2001)); (2) Flag's representation in Flag's Form 10–Q for 2Q:01 that an increase in revenue was the result of "continued growth in capacity sales and activations on the Flag Telecom network," (*id.* ¶ 177); and (3) Bande's optimistic statements in the company's November 6, 2001 press release. (*Id.* ¶ 179.)

### B. *Scienter*

■ The PSLRA further requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). The requisite state of mind under § 10(b) and Rule 10b–5 is scienter. *Suez Equity Investors*, 250 F.3d at 95. A plaintiff may establish a strong inference of scienter by pleading facts: (1) that demonstrate the defendants had both the motive and opportunity to commit fraud; or (2) that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000). Motive and opportunity are established if the plaintiff alleges "'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged'" and that the defendant had the means necessary to profit from the alleged fraud. *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). A plaintiff can also establish a strong inference of scienter by pleading facts that tend to show the defendant acted recklessly. The Second Circuit has noted that

> securities fraud claims typically have sufficed to state a claim based on reck-

lessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

*Id.*

The Second Circuit has also noted that a plaintiff is not required to plead scienter with "great specificity." *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 169 (2d Cir. 2000); *see also In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir.2001) ("[W]e do not require the pleading of detailed evidentiary matter in securities litigation."). Accordingly, "a plaintiff need not plead dates, times and places with absolute precision," *Int'l Motor Sports Group, Inc. v. Gordon,* No. 98 Civ. 5611 (MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug.16, 1999), or precisely quantify the amount by which financial statements were overstated. *See Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 81 (1st Cir.2002). When a plaintiff has pled facts that indicate the defendant's financial statements were false, the plaintiff " 'must supply some factual basis for the allegation that the defendants' " knew or should have known that the statements were false " 'at some point during the time period alleged.' " *Rothman,* 220 F.3d at 91 (quoting *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 (S.D.N.Y.1981)); *see also Scholastic,* 252 F.3d at 77.

▆ The allegations in the 3CAC are sufficient to create the requisite strong inference of scienter with respect to Bande, McCormack and Bautista but are insufficient with respect to Evans. As discussed *supra* in the Discussion Section

Part VI.A., plaintiff has alleged that Flag improperly booked revenues from fraudulent swap transactions and, as a result, its reported financial results were false when issued. Plaintiff has alleged facts demonstrating that McCormack was the Flag executive who negotiated Flag's reciprocal transactions and ordered Flag's sales force to pursue such deals. (*Id.* ¶¶ 146–47, 149.) He has also alleged facts tending to show that Bande and Bautista were at least familiar with the reciprocal transactions. (*Id.* ¶¶ 146, 149.) The 3CAC also contains allegations that are sufficient for pleading purposes to demonstrate that high level officers within Flag who were responsible for the issuance of the company's financial statements, and were familiar with the swap transactions, knew or should have known that Flag's reported financial results were false or misleading. Plaintiffs have alleged that it was common knowledge among employees familiar with Flag's finances that Flag was entering into improper swaps to inflate revenue figures. Moreover, it was apparent among industry insiders that many of the companies with whom Flag did business had utilized " 'hollow swaps' which served no purpose other than to inflate a company's bottom line." (*Id.* ¶ 14.)

▆ Bande and McCormack were responsible for the issuance of Flag's financial results throughout the class period.[25] Bautista served as Flag's CFO from November 2000 to August 2001. As CFO, Bautista was responsible for Flag's reported financial results issued in Flag's Form 10–K for FY:00 and Forms 10–Q for 1Q:01 and 2Q:01. As discussed *supra* in the Discussion Section Part VI.A., Flag entered

25. McCormack was Flag's CFO until November 2000 and served as Flag's Chief Operating Officer from March 2000 until the company filed its Chapter 11 bankruptcy petition. (*Id.* ¶ 54.) Bande was Flag's CEO and Chairman of the Board of Directors throughout the class period. (*Id.* ¶ 53.) McCormack signed Flag's Forms 10–Q for the 2Q:00, 3Q:00, 1Q:01, 2Q:01, 3Q:01 and the company's Forms 10–K for FY:00 and FY:01.

into several allegedly improper swaps during this period. We conclude that plaintiff has alleged that Bande, McCormack and Bautista knew or should have known that Flag's financial results were false when issued. However, the allegations in the 3CAC are insufficient to create a strong inference of scienter with respect to Evans because: (1) he did not join the company as its CTO until January 2002, several months after the last improper swap alleged in the 3CAC and one month before Flag revealed that it was reviewing its business; and (2) there is no indication in the 3CAC that Evans had any responsibility for the issuance of Flag's allegedly false financial results. Accordingly, the motions of Bande, McCormack and Bautista to dismiss plaintiff's § 10(b) and Rule 10b–5 claims against them are denied. Evans motion to dismiss on this point is granted and plaintiff's § 10(b) and Rule 10b–5 claims against him are dismissed.

## VII. *Plaintiff's § 20(a) Claims*

■ Plaintiff asserts claims against Bande, McCormack, Evans, Bautista and Verizon under § 20(a) of the Exchange Act. Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable ... to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a *prima facie* case under § 20(a) "a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d

715, 720 (2d Cir.1998) (quoting *First Jersey Sec.,* 101 F.3d at 1472); *see also Suez Equity Investors,* 250 F.3d at 101.

We have previously held that a plaintiff has adequately. pled "control" under § 20(a) when he has alleged that the defendant controlled the content of company press releases and public filings.' *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 289 (S.D.N.Y.1999) (Conner, J.). Moreover, where it is alleged that an officer or director signed an allegedly fraudulent SEC filing, courts have concluded that "control" was adequately pled. *See CINAR,* 186 F.Supp.2d at 309; *Jacobs v. Coopers & Lybrand, L.L.P.,* No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *17 (S.D.N.Y. Mar.1, 1999); *see also In re Leslie Fay Companies, Inc. Sec. Litig.,* 918 F.Supp. at 763–64. Indeed, "[i]t does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." *Jacobs,* 1999 WL 101772, at *17.

As discussed *supra* in the Discussion Section Part VI.B., Bande and McCormack signed various SEC filings containing the financial results that plaintiff has alleged were false or misleading when issued. Plaintiff has also alleged that Bautista, as CFO, was responsible for the preparation of Flag's Form 10–K for FY:00 and Forms 10–Q for 1Q:01 and 2Q:01. Moreover, as discussed *supra* in the Discussion Section Part VI.B., plaintiff has pled facts sufficient to create a strong inference of scienter with respect to Bande, McCormack and Bautista. Accordingly, plaintiff has pled that Bande, McCormack and Bautista were control persons and that they were " 'in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky,* 159 F.3d at 720 (quoting *First Jersey Sec.,* 101 F.3d at 1472). The motions of Bande, McCormack and Bautista

to dismiss plaintiff's § 20(a) claims are therefore denied.

 However, we grant Evans' motion to dismiss the § 20(a) claims against him. As discussed *supra* in the Discussion Section Part VI.B., plaintiff has not alleged that Evans had any involvement in the preparation of Flag's allegedly false or misleading financial results. Moreover, as discussed *supra* in the Discussion Section Part V.A., plaintiff does not allege that Evans otherwise controlled Flag or any other primary violator. Finally, as discussed *supra* in the Discussion Section Part V.B., plaintiff has not adequately alleged that Verizon is a control person of Flag. Accordingly, we grant Verizon's motion to dismiss plaintiff's § 20(a) claims against it.

### CONCLUSION

For the reasons stated herein, defendant Flag Telecom Holding Group, Ltd.'s ("Flag") motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) is granted and all of the claims against Flag in the 3CAC are dismissed with prejudice. The motion of defendant Andrew Evans to dismiss pursuant to Rules 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for failure to state a claim is also granted in its entirety and all of the claims raised in the 3CAC against Evans are dismissed with prejudice. The motion of defendant Verizon Communications, Inc. to dismiss plaintiff's Securities Act and Exchange Act claims against it is granted, and the 3CAC is dismissed with respect to Verizon without prejudice.

Defendant Larry Bautista's motion to dismiss under Rules 12(b)(6) and 9(b) and the PSLRA for failure to state a claim is granted as to plaintiff's claims against Bautista under §§ 11, 12(a)(2) and 15 of the Securities Act and those claims are dismissed with prejudice. Bautista's motion to dismiss plaintiff's claims under

§ 20(a) and § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder is denied.

Finally the motions of defendants Andres Bande, Edward McCormack, Stuart Rubin, Daniel Petri, Edward McQuaid, Philip Seskin, Dr. Lim Lek Suan, and Salomon Smith Barney, Inc. n/k/a Citigroup Global Markets, Inc., to dismiss pursuant to Rules 12(b)(6) and 9(b) and the PSLRA for failure to state a claim are denied in their entirety.

Plaintiff's motion to strike is denied as moot. Plaintiff is granted leave to file promptly a Fourth Consolidated Amended Complaint in order to replead the claims that this Court has dismissed without prejudice.

SO ORDERED.